# ADARAND CONSTRUCTORS, INC. *v.* PENA, SECRETARY OF TRANSPORTATION, ET AL.

No. 93–1841.   Argued January 17, 1995—Decided June 12, 1995

O'CONNOR, J., announced the judgment of the Court and delivered an opinion with respect to Parts I, II, III–A, III–B, III–D, and IV, which was for the Court except insofar as it might be inconsistent with the views expressed in the concurrence of SCALIA, J., and an opinion with respect to Part III–C.  Parts I, II, III–A, III–B, III–D, and IV of that opinion were joined by REHNQUIST, C. J., and KENNEDY and THOMAS, JJ., and by

SCALIA, J., to the extent heretofore indicated; and Part III–C was joined by KENNEDY, J. SCALIA, J., *post*, p. 239, and THOMAS, J., *post*, p. 240, filed opinions concurring in part and concurring in the judgment. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 242. SOUTER, J., filed a dissenting opinion, in which GINSBURG and BREYER, JJ., joined, *post*, p. 264. GINSBURG, J., filed a dissenting opinion, in which BREYER, J., joined, *post*, p. 271.

*William Perry Pendley* argued the cause for petitioner. With him on the briefs were *Todd S. Welch* and *Steven J. Lechner.*

*Solicitor General Days* argued the cause for respondents. With him on the brief were *Assistant Attorney General Patrick, Deputy Solicitor General Bender, Cornelia T. L. Pillard, David K. Flynn, Lisa C. Wilson, Paul M. Geier,* and *Edward V. A. Kussy.**

---

*Briefs of *amici curiae* urging reversal were filed for Associated General Contractors of America, Inc., by *John G. Roberts, Jr., David G. Leitch,* and *Michael E. Kennedy;* for the Atlantic Legal Foundation by *Martin S. Kaufman;* for the Federalist Society, Ohio State University College of Law Chapter, by *Michael D. Rose;* for L. S. Lee, Inc., et al. by *Walter H. Ryland;* for the Pacific Legal Foundation by *Ronald A. Zumbrun, John H. Findley,* and *Anthony T. Caso;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo* and *Richard A. Samp.*

Briefs of *amici curiae* urging affirmance were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Evelyn O. Cannon,* Assistant Attorney General, *Grant Woods,* Attorney General of Arizona, *Richard Blumenthal,* Attorney General of Connecticut, *Robert A. Marks,* Attorney General of Hawaii, *Roland W. Burris,* Attorney General of Illinois, *Pamela F. Carter,* Attorney General of Indiana, *Scott Harshbarger,* Attorney General of Massachusetts, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Tom Udall,* Attorney General of New Mexico, *G. Oliver Koppell,* Attorney General of New York, *Michael F. Easley,* Attorney General of North Carolina, *Lee Fisher,* Attorney General of Ohio, *Theodore R. Kulongoski,* Attorney General of Oregon, *Christine O. Gregoire,* Attorney General of Washington, *James E. Doyle,* Attorney General of Wisconsin, *Erias A. Hyman,* Acting Corporation Counsel for the District of Columbia, and *Eleni M. Constantine;* for the Coalition for Economic Equity et al. by *William C. McNeill III* and *Judith E. Kurtz;* for the Congressional Asian Pacific American Caucus et al. by *Koteles Alexander* and *Brian J. Murphy;* for the Congressional

JUSTICE O'CONNOR announced the judgment of the Court and delivered an opinion with respect to Parts I, II, III–A, III–B, III–D, and IV, which is for the Court except insofar as it might be inconsistent with the views expressed in JUSTICE SCALIA's concurrence, and an opinion with respect to Part III–C in which JUSTICE KENNEDY joins.

Petitioner Adarand Constructors, Inc., claims that the Federal Government's practice of giving general contractors on Government projects a financial incentive to hire subcontractors controlled by "socially and economically disadvantaged individuals," and in particular, the Government's use of race-based presumptions in identifying such individuals, violates the equal protection component of the Fifth Amendment's Due Process Clause. The Court of Appeals rejected Adarand's claim. We conclude, however, that courts should analyze cases of this kind under a different standard of review than the one the Court of Appeals applied. We there-

Black Caucus by *H. Russell Frisby, Jr.,* and *Thomas J. Madden;* for the Equality in Enterprise Opportunities Association, Inc., by *Kenneth A. Martin;* for the Latin American Management Association by *Pamela J. Mazza;* for the Lawyers' Committee for Civil Rights Under Law et al. by *John Payton, John H. Pickering, Michael A. Cooper, Herbert J. Hansell, Thomas J. Henderson, Richard T. Seymour, Sharon R. Vinick, Steven R. Shapiro, Donna R. Lenhoff,* and *Marcia D. Greenberger;* for the Minority Business Enterprise Legal Defense and Education Fund, Inc., et al. by *Donald B. Verrilli, Jr.,* and *Maureen F. Del Duca;* for the Minority Media and Telecommunications Council et al. by *David Honig* and *Angela Campbell;* for the National Association for the Advancement of Colored People by *Ronald D. Maines, Dennis Courtland Hayes,* and *Willie Abrams;* and for the National Coalition of Minority Businesses by *Weldon H. Latham.*

Briefs of *amici curiae* were filed for the NAACP Legal Defense and Educational Fund, Inc., by *Elaine R. Jones, Theodore M. Shaw, Charles Stephen Ralston,* and *Eric Schnapper;* for the National Association of Minority Businesses by *Carlos M. Sandoval* and *Warren W. Grossman;* for the Maryland Women Business Entrepreneurs Association et al. by *Kathleen T. Schwallie, Janice K. Cunningham,* and *Peter A. Teholiz;* and for the National Bar Association et al. by *J. Clay Smith, Jr.*

fore vacate the Court of Appeals' judgment and remand the case for further proceedings.

## I

In 1989, the Central Federal Lands Highway Division (CFLHD), which is part of the United States Department of Transportation (DOT), awarded the prime contract for a highway construction project in Colorado to Mountain Gravel & Construction Company. Mountain Gravel then solicited bids from subcontractors for the guardrail portion of the contract. Adarand, a Colorado-based highway construction company specializing in guardrail work, submitted the low bid. Gonzales Construction Company also submitted a bid.

The prime contract's terms provide that Mountain Gravel would receive additional compensation if it hired subcontractors certified as small businesses controlled by "socially and economically disadvantaged individuals," App. 24. Gonzales is certified as such a business; Adarand is not. Mountain Gravel awarded the subcontract to Gonzales, despite Adarand's low bid, and Mountain Gravel's Chief Estimator has submitted an affidavit stating that Mountain Gravel would have accepted Adarand's bid, had it not been for the additional payment it received by hiring Gonzales instead. *Id.,* at 28–31. Federal law requires that a subcontracting clause similar to the one used here must appear in most federal agency contracts, and it also requires the clause to state that "[t]he contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities, or any other individual found to be disadvantaged by the [Small Business] Administration pursuant to section 8(a) of the Small Business Act." 15 U. S. C. §§ 637(d)(2), (3). Adarand claims that the presumption set forth in that statute discriminates on the basis of

race in violation of the Federal Government's Fifth Amendment obligation not to deny anyone equal protection of the laws.

These fairly straightforward facts implicate a complex scheme of federal statutes and regulations, to which we now turn. The Small Business Act (Act), 72 Stat. 384, as amended, 15 U. S. C. § 631 *et seq.*, declares it to be "the policy of the United States that small business concerns, [and] small business concerns owned and controlled by socially and economically disadvantaged individuals, . . . shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency." § 8(d)(1), 15 U. S. C. § 637(d)(1). The Act defines "socially disadvantaged individuals" as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," § 8(a)(5), 15 U. S. C. § 637(a)(5), and it defines "economically disadvantaged individuals" as "those socially disadvantaged individuals whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." § 8(a)(6)(A), 15 U. S. C. § 637(a)(6)(A).

In furtherance of the policy stated in § 8(d)(1), the Act establishes "[t]he Government-wide goal for participation by small business concerns owned and controlled by socially and economically disadvantaged individuals" at "not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." 15 U. S. C. § 644(g)(1). It also requires the head of each federal agency to set agency-specific goals for participation by businesses controlled by socially and economically disadvantaged individuals. *Ibid.*

The Small Business Administration (SBA) has implemented these statutory directives in a variety of ways, two of which are relevant here. One is the "8(a) program,"

which is available to small businesses controlled by socially and economically disadvantaged individuals as the SBA has defined those terms. The 8(a) program confers a wide range of benefits on participating businesses, see, *e. g.,* 13 CFR §§ 124.303–124.311, 124.403 (1994); 48 CFR subpt. 19.8 (1994), one of which is automatic eligibility for subcontractor compensation provisions of the kind at issue in this case, 15 U. S. C. § 637(d)(3)(C) (conferring presumptive eligibility on anyone "found to be disadvantaged . . . pursuant to section 8(a) of the Small Business Act"). To participate in the 8(a) program, a business must be "small," as defined in 13 CFR § 124.102 (1994); and it must be 51% owned by individuals who qualify as "socially and economically disadvantaged," § 124.103. The SBA presumes that black, Hispanic, Asian Pacific, Subcontinent Asian, and Native Americans, as well as "members of other groups designated from time to time by SBA," are "socially disadvantaged," § 124.105(b)(1). It also allows any individual not a member of a listed group to prove social disadvantage "on the basis of clear and convincing evidence," as described in § 124.105(c). Social disadvantage is not enough to establish eligibility, however; SBA also requires each 8(a) program participant to prove "economic disadvantage" according to the criteria set forth in § 124.106(a).

The other SBA program relevant to this case is the "8(d) subcontracting program," which unlike the 8(a) program is limited to eligibility for subcontracting provisions like the one at issue here. In determining eligibility, the SBA presumes social disadvantage based on membership in certain minority groups, just as in the 8(a) program, and again appears to require an individualized, although "less restrictive," showing of economic disadvantage, § 124.106(b). A different set of regulations, however, says that members of minority groups wishing to participate in the 8(d) subcontracting program are entitled to a race-based presumption of social *and* economic disadvantage. 48 CFR §§ 19.001,

19.703(a)(2) (1994). We are left with some uncertainty as to whether participation in the 8(d) subcontracting program requires an individualized showing of economic disadvantage. In any event, in both the 8(a) and the 8(d) programs, the presumptions of disadvantage are rebuttable if a third party comes forward with evidence suggesting that the participant is not, in fact, either economically or socially disadvantaged. 13 CFR §§ 124.111(c)–(d), 124.601–124.609 (1994).

The contract giving rise to the dispute in this case came about as a result of the Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. 100–17, 101 Stat. 132 (STURAA), a DOT appropriations measure. Section 106(c)(1) of STURAA provides that "not less than 10 percent" of the appropriated funds "shall be expended with small business concerns owned and controlled by socially and economically disadvantaged individuals." 101 Stat. 145. STURAA adopts the Small Business Act's definition of "socially and economically disadvantaged individual," including the applicable race-based presumptions, and adds that "women shall be presumed to be socially and economically disadvantaged individuals for purposes of this subsection." § 106(c)(2)(B), 101 Stat. 146. STURAA also requires the Secretary of Transportation to establish "minimum uniform criteria for State governments to use in certifying whether a concern qualifies for purposes of this subsection." § 106(c)(4), 101 Stat. 146. The Secretary has done so in 49 CFR pt. 23, subpt. D (1994). Those regulations say that the certifying authority should presume both social and economic disadvantage (i. e., eligibility to participate) if the applicant belongs to certain racial groups, or is a woman. 49 CFR § 23.62 (1994); 49 CFR pt. 23, subpt. D, App. C (1994). As with the SBA programs, third parties may come forward with evidence in an effort to rebut the presumption of disadvantage for a particular business. 49 CFR § 23.69 (1994).

The operative clause in the contract in this case reads as follows:

"*Subcontracting.* This subsection is supplemented to include a Disadvantaged Business Enterprise (DBE) Development and Subcontracting Provision as follows:

"Monetary compensation is offered for awarding subcontracts to small business concerns owned and controlled by socially and economically disadvantaged individuals. . . .

"A small business concern will be considered a DBE after it has been certified as such by the U. S. Small Business Administration or any State Highway Agency. Certification by other Government agencies, counties, or cities may be acceptable on an individual basis provided the Contracting Officer has determined the certifying agency has an acceptable and viable DBE certification program. If the Contractor requests payment under this provision, the Contractor shall furnish the engineer with acceptable evidence of the subcontractor(s) DBE certification and shall furnish one certified copy of the executed subcontract(s).

. . . . .

"The Contractor will be paid an amount computed as follows:

"1. If a subcontract is awarded to one DBE, 10 percent of the final amount of the approved DBE subcontract, not to exceed 1.5 percent of the original contract amount.

"2. If subcontracts are awarded to two or more DBEs, 10 percent of the final amount of the approved DBE subcontracts, not to exceed 2 percent of the original contract amount." App. 24–26.

To benefit from this clause, Mountain Gravel had to hire a subcontractor who had been certified as a small disadvantaged business by the SBA, a state highway agency, or some other certifying authority acceptable to the contracting officer. Any of the three routes to such certification described above—SBA's 8(a) or 8(d) program, or certification by a State

under the DOT regulations—would meet that requirement. The record does not reveal how Gonzales obtained its certification as a small disadvantaged business.

After losing the guardrail subcontract to Gonzales, Adarand filed suit against various federal officials in the United States District Court for the District of Colorado, claiming that the race-based presumptions involved in the use of subcontracting compensation clauses violate Adarand's right to equal protection. The District Court granted the Government's motion for summary judgment. *Adarand Constructors, Inc.* v. *Skinner*, 790 F. Supp. 240 (1992). The Court of Appeals for the Tenth Circuit affirmed. 16 F. 3d 1537 (1994). It understood our decision in *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), to have adopted "a lenient standard, resembling intermediate scrutiny, in assessing" the constitutionality of federal race-based action. 16 F. 3d, at 1544. Applying that "lenient standard," as further developed in *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990), the Court of Appeals upheld the use of subcontractor compensation clauses. 16 F. 3d, at 1547. We granted certiorari. 512 U. S. 1288 (1994).

## II

Adarand, in addition to its general prayer for "such other and further relief as to the Court seems just and equitable," specifically seeks declaratory and injunctive relief against any *future* use of subcontractor compensation clauses. App. 22–23 (complaint). Before reaching the merits of Adarand's challenge, we must consider whether Adarand has standing to seek forward-looking relief. Adarand's allegation that it has lost a contract in the past because of a subcontractor compensation clause of course entitles it to seek damages for the loss of that contract (we express no view, however, as to whether sovereign immunity would bar such relief on these facts). But as we explained in *Los Angeles* v. *Lyons*, 461 U. S. 95 (1983), the fact of past injury, "while presumably affording [the plaintiff] standing to claim damages . . . , does

nothing to establish a real and immediate threat that he would again" suffer similar injury in the future. *Id.*, at 105.

If Adarand is to maintain its claim for forward-looking relief, our cases require it to allege that the use of subcontractor compensation clauses in the future constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan* v. *Defenders of Wildlife,* 504 U. S. 555, 560 (1992) (footnote, citations, and internal quotation marks omitted). Adarand's claim that the Government's use of subcontractor compensation clauses denies it equal protection of the laws of course alleges an invasion of a legally protected interest, and it does so in a manner that is "particularized" as to Adarand. We note that, contrary to respondents' suggestion, see Brief for Respondents 29–30, Adarand need not demonstrate that it has been, or will be, the low bidder on a Government contract. The injury in cases of this kind is that a "discriminatory classification prevent[s] the plaintiff from competing on an equal footing." *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville,* 508 U. S. 656, 667 (1993). The aggrieved party "need not allege that he would have obtained the benefit but for the barrier in order to establish standing." *Id.,* at 666.

It is less clear, however, that the future use of subcontractor compensation clauses will cause Adarand "imminent" injury. We said in *Lujan* that "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is '*certainly* impending.'" *Lujan, supra,* at 565, n. 2. We therefore must ask whether Adarand has made an adequate showing that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors.

We conclude that Adarand has satisfied this requirement. Adarand's general manager said in a deposition that his company bids on every guardrail project in Colorado. See Reply Brief for Petitioner 5–A. According to documents produced in discovery, the CFLHD let 14 prime contracts in Colorado that included guardrail work between 1983 and 1990. Plaintiff's Motion for Summary Judgment in No. 90–C–1413, Exh. I, Attachment A (D. Colo.). Two of those contracts do not present the kind of injury Adarand alleges here. In one, the prime contractor did not subcontract out the guardrail work; in another, the prime contractor was itself a disadvantaged business, and in such cases the contract generally does not include a subcontractor compensation clause. *Ibid.;* see also *id.,* Supplemental Exhibits, Deposition of Craig Actis 14 (testimony of CFLHD employee that 8(a) contracts do not include subcontractor compensation clauses). Thus, statistics from the years 1983 through 1990 indicate that the CFLHD lets on average 1½ contracts per year that could injure Adarand in the manner it alleges here. Nothing in the record suggests that the CFLHD has altered the frequency with which it lets contracts that include guardrail work. And the record indicates that Adarand often must compete for contracts against companies certified as small disadvantaged businesses. See *id.,* Exh. F, Attachments 1–3. Because the evidence in this case indicates that the CFLHD is likely to let contracts involving guardrail work that contain a subcontractor compensation clause at least once per year in Colorado, that Adarand is very likely to bid on each such contract, and that Adarand often must compete for such contracts against small disadvantaged businesses, we are satisfied that Adarand has standing to bring this lawsuit.

## III

Respondents urge that "[t]he Subcontracting Compensation Clause program is . . . a program based on *disadvantage,* not on race," and thus that it is subject only to "the most

"relaxed judicial scrutiny." Brief for Respondents 26. To the extent that the statutes and regulations involved in this case are race neutral, we agree. Respondents concede, however, that "the race-based rebuttable presumption used in some certification determinations under the Subcontracting Compensation Clause" is subject to some heightened level of scrutiny. *Id.*, at 27. The parties disagree as to what that level should be. (We note, incidentally, that this case concerns only classifications based explicitly on race, and presents none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose. See generally *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977); *Washington* v. *Davis*, 426 U. S. 229 (1976).)

Adarand's claim arises under the Fifth Amendment to the Constitution, which provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law." Although this Court has always understood that Clause to provide some measure of protection against *arbitrary* treatment by the Federal Government, it is not as explicit a guarantee of *equal* treatment as the Fourteenth Amendment, which provides that "No *State* shall . . . deny to any person within its jurisdiction the equal protection of the laws" (emphasis added). Our cases have accorded varying degrees of significance to the difference in the language of those two Clauses. We think it necessary to revisit the issue here.

## A

Through the 1940's, this Court had routinely taken the view in non-race-related cases that, "[u]nlike the Fourteenth Amendment, the Fifth contains no equal protection clause and it provides no guaranty against discriminatory legislation by Congress." *Detroit Bank* v. *United States*, 317 U. S. 329, 337 (1943); see also, *e. g.*, *Helvering* v. *Lerner Stores Corp.*, 314 U. S. 463, 468 (1941); *LaBelle Iron Works* v. *United*

*States*, 256 U. S. 377, 392 (1921) ("Reference is made to cases decided under the equal protection clause of the Fourteenth Amendment . . . ; but clearly they are not in point. The Fifth Amendment has no equal protection clause"). When the Court first faced a Fifth Amendment equal protection challenge to a federal racial classification, it adopted a similar approach, with most unfortunate results. In *Hirabayashi* v. *United States*, 320 U. S. 81 (1943), the Court considered a curfew applicable only to persons of Japanese ancestry. The Court observed—correctly—that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality," and that "racial discriminations are in most circumstances irrelevant and therefore prohibited." *Id.*, at 100. But it also cited *Detroit Bank* for the proposition that the Fifth Amendment "restrains only such discriminatory legislation by Congress as amounts to a denial of due process," 320 U. S., at 100, and upheld the curfew because "circumstances within the knowledge of those charged with the responsibility for maintaining the national defense afforded a rational basis for the decision which they made." *Id.*, at 102.

Eighteen months later, the Court again approved wartime measures directed at persons of Japanese ancestry. *Korematsu* v. *United States*, 323 U. S. 214 (1944), concerned an order that completely excluded such persons from particular areas. The Court did not address the view, expressed in cases like *Hirabayashi* and *Detroit Bank,* that the Federal Government's obligation to provide equal protection differs significantly from that of the States. Instead, it began by noting that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect . . . [and] courts must subject them to the most rigid scrutiny." 323 U. S., at 216. That promising dictum might be read to undermine the view that the Federal Government is under a lesser obligation to avoid injurious racial classifications

than are the States. Cf. *id.*, at 234–235 (Murphy, J., dissenting) ("[T]he order deprives all those within its scope of the equal protection of the laws as guaranteed by the Fifth Amendment"). But in spite of the "most rigid scrutiny" standard it had just set forth, the Court then inexplicably relied on "the principles we announced in the *Hirabayashi* case," *id.*, at 217, to conclude that, although "exclusion from the area in which one's home is located is a far greater deprivation than constant confinement to the home from 8 p. m. to 6 a. m.," *id.*, at 218, the racially discriminatory order was nonetheless within the Federal Government's power.*

In *Bolling* v. *Sharpe*, 347 U. S. 497 (1954), the Court for the first time explicitly questioned the existence of any difference between the obligations of the Federal Government and the States to avoid racial classifications. *Bolling* did note that "[t]he 'equal protection of the laws' is a more explicit safeguard of prohibited unfairness than 'due process of law,'" *id.*, at 499. But *Bolling* then concluded that, "[i]n view of [the] decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government." *Id.*, at 500.

*Bolling*'s facts concerned school desegregation, but its reasoning was not so limited. The Court's observations that "[d]istinctions between citizens solely because of their ancestry are by their very nature odious," *Hirabayashi, supra,* at 100, and that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect,"

---

*Justices Roberts, Murphy, and Jackson filed vigorous dissents; Justice Murphy argued that the challenged order "falls into the ugly abyss of racism." *Korematsu,* 323 U. S., at 233. Congress has recently agreed with the dissenters' position, and has attempted to make amends. See Pub. L. 100–383, § 2(a), 102 Stat. 903 ("The Congress recognizes that . . . a grave injustice was done to both citizens and permanent resident aliens of Japanese ancestry by the evacuation, relocation, and internment of civilians during World War II").

*Korematsu, supra,* at 216, carry no less force in the context of federal action than in the context of action by the States—indeed, they first appeared in cases concerning action by the Federal Government. *Bolling* relied on those observations, 347 U. S., at 499, n. 3, and reiterated " 'that the Constitution of the United States, in its present form, forbids, so far as civil and political rights are concerned, discrimination *by the General Government, or by the States,* against any citizen because of his race,' " *id.,* at 499 (quoting *Gibson* v. *Mississippi,* 162 U. S. 565, 591 (1896)) (emphasis added). The Court's application of that general principle to the case before it, and the resulting imposition on the Federal Government of an obligation equivalent to that of the States, followed as a matter of course.

Later cases in contexts other than school desegregation did not distinguish between the duties of the States and the Federal Government to avoid racial classifications. Consider, for example, the following passage from *McLaughlin* v. *Florida,* 379 U. S. 184, a 1964 case that struck down a race-based state law:

> "[W]e deal here with a classification based upon the race of the participants, which must be viewed in light of the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States. This strong policy renders racial classifications 'constitutionally suspect,' *Bolling* v. *Sharpe,* 347 U. S. 497, 499; and subject to the 'most rigid scrutiny,' *Korematsu* v. *United States,* 323 U. S. 214, 216; and 'in most circumstances irrelevant' to any constitutionally acceptable legislative purpose, *Hirabayashi* v. *United States,* 320 U. S. 81, 100." *Id.,* at 191–192.

*McLaughlin's* reliance on cases involving federal action for the standards applicable to a case involving state legislation

suggests that the Court understood the standards for federal and state racial classifications to be the same.

Cases decided after *McLaughlin* continued to treat the equal protection obligations imposed by the Fifth and the Fourteenth Amendments as indistinguishable; one commentator observed that "[i]n case after case, fifth amendment equal protection problems are discussed on the assumption that fourteenth amendment precedents are controlling." Karst, The Fifth Amendment's Guarantee of Equal Protection, 55 N. C. L. Rev. 541, 554 (1977). *Loving* v. *Virginia,* 388 U. S. 1 (1967), which struck down a race-based state law, cited *Korematsu* for the proposition that "the Equal Protection Clause demands that racial classifications . . . be subjected to the 'most rigid scrutiny.'" 388 U. S., at 11. The various opinions in *Frontiero* v. *Richardson,* 411 U. S. 677 (1973), which concerned sex discrimination by the Federal Government, took their equal protection standard of review from *Reed* v. *Reed,* 404 U. S. 71 (1971), a case that invalidated sex discrimination by a State, without mentioning any possibility of a difference between the standards applicable to state and federal action. *Frontiero,* 411 U. S., at 682–684 (plurality opinion of Brennan, J.); *id.,* at 691 (Stewart, J., concurring in judgment); *id.,* at 692 (Powell, J., concurring in judgment). Thus, in 1975, the Court stated explicitly that "[t]his Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638, n. 2; see also *Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment"); *United States* v. *Paradise,* 480 U. S. 149, 166, n. 16 (1987) (plurality opinion of Brennan, J.) ("[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth"). We do not understand a few contrary suggestions appearing in cases in which we found special deference to

the political branches of the Federal Government to be appropriate, *e. g., Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100, 101–102, n. 21 (1976) (federal power over immigration), to detract from this general rule.

## B

Most of the cases discussed above involved classifications burdening groups that have suffered discrimination in our society. In 1978, the Court confronted the question whether race-based governmental action designed to *benefit* such groups should also be subject to "the most rigid scrutiny." *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265, involved an equal protection challenge to a state-run medical school's practice of reserving a number of spaces in its entering class for minority students. The petitioners argued that "strict scrutiny" should apply only to "classifications that disadvantage 'discrete and insular minorities.'" *Id.,* at 287–288 (opinion of Powell, J.) (citing *United States* v. *Carolene Products Co.,* 304 U. S. 144, 152, n. 4 (1938)). *Bakke* did not produce an opinion for the Court, but Justice Powell's opinion announcing the Court's judgment rejected the argument. In a passage joined by Justice White, Justice Powell wrote that "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." 438 U. S., at 289–290. He concluded that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination." *Id.,* at 291. On the other hand, four Justices in *Bakke* would have applied a less stringent standard of review to racial classifications "designed to further remedial purposes," see *id.,* at 359 (Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). And four Justices thought the case should be decided on statutory grounds. *Id.,* at 411–412, 421 (STEVENS, J., joined by Burger, C. J., and Stewart and REHN-

QUIST, JJ., concurring in judgment in part and dissenting in part).

Two years after *Bakke*, the Court faced another challenge to remedial race-based action, this time involving action undertaken by the Federal Government. In *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), the Court upheld Congress' inclusion of a 10% set-aside for minority-owned businesses in the Public Works Employment Act of 1977. As in *Bakke*, there was no opinion for the Court. Chief Justice Burger, in an opinion joined by Justices White and Powell, observed that "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees." 448 U. S., at 491. That opinion, however, "d[id] not adopt, either expressly or implicitly, the formulas of analysis articulated in such cases as *[Bakke]*." *Id.*, at 492. It employed instead a two-part test which asked, first, "whether the *objectives* of th[e] legislation are within the power of Congress," and second, "whether the limited use of racial and ethnic criteria, in the context presented, is a constitutionally permissible *means* for achieving the congressional objectives." *Id.*, at 473. It then upheld the program under that test, adding at the end of the opinion that the program also "would survive judicial review under either 'test' articulated in the several *Bakke* opinions." *Id.*, at 492. Justice Powell wrote separately to express his view that the plurality opinion had essentially applied "strict scrutiny" as described in his *Bakke* opinion—*i. e.*, it had determined that the set-aside was "a necessary means of advancing a compelling governmental interest"—and had done so correctly. 448 U. S., at 496 (concurring opinion). Justice Stewart (joined by then-JUSTICE REHNQUIST) dissented, arguing that the Constitution required the Federal Government to meet the same strict standard as the States when enacting racial classifications, *id.*, at 523, and n. 1, and that the program before the Court failed that standard. JUSTICE STEVENS also dis-

sented, arguing that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification," *id.*, at 537, and that the program before the Court could not be characterized "as a 'narrowly tailored' remedial measure." *Id.*, at 541. Justice Marshall (joined by Justices Brennan and Blackmun) concurred in the judgment, reiterating the view of four Justices in *Bakke* that any race-based governmental action designed to "remed[y] the present effects of past racial discrimination" should be upheld if it was "substantially related" to the achievement of an "important governmental objective"—*i. e.*, such action should be subjected only to what we now call "intermediate scrutiny." 448 U. S., at 518–519.

In *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267 (1986), the Court considered a Fourteenth Amendment challenge to another form of remedial racial classification. The issue in *Wygant* was whether a school board could adopt race-based preferences in determining which teachers to lay off. Justice Powell's plurality opinion observed that "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination," *id.*, at 273, and stated the two-part inquiry as "whether the layoff provision is supported by a compelling state purpose and whether the means chosen to accomplish that purpose are narrowly tailored." *Id.*, at 274. In other words, "racial classifications of any sort must be subjected to 'strict scrutiny.'" *Id.*, at 285 (O'CONNOR, J., concurring in part and concurring in judgment). The plurality then concluded that the school board's interest in "providing minority role models for its minority students, as an attempt to alleviate the effects of societal discrimination," *id.*, at 274, was not a compelling interest that could justify the use of a racial classification. It added that "[s]ocietal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy," *id.*, at 276, and insisted instead that "a public employer . . . must

ensure that, before it embarks on an affirmative-action program, it has convincing evidence that remedial action is warranted. That is, it must have sufficient evidence to justify the conclusion that there has been prior discrimination," *id.,* at 277. Justice White concurred only in the judgment, although he agreed that the school board's asserted interests could not, "singly or together, justify this racially discriminatory layoff policy." *Id.,* at 295. Four Justices dissented, three of whom again argued for intermediate scrutiny of remedial race-based government action. *Id.,* at 301–302 (Marshall, J., joined by Brennan and Blackmun, JJ., dissenting).

The Court's failure to produce a majority opinion in *Bakke, Fullilove,* and *Wygant* left unresolved the proper analysis for remedial race-based governmental action. See *United States* v. *Paradise,* 480 U. S., at 166 (plurality opinion of Brennan, J.) ("[A]lthough this Court has consistently held that some elevated level of scrutiny is required when a racial or ethnic distinction is made for remedial purposes, it has yet to reach consensus on the appropriate constitutional analysis"); *Sheet Metal Workers* v. *EEOC,* 478 U. S. 421, 480 (1986) (plurality opinion of Brennan, J.). Lower courts found this lack of guidance unsettling. See, *e. g., Kromnick* v. *School Dist. of Philadelphia,* 739 F. 2d 894, 901 (CA3 1984) ("The absence of an Opinion of the Court in either *Bakke* or *Fullilove* and the concomitant failure of the Court to articulate an analytic framework supporting the judgments makes the position of the lower federal courts considering the constitutionality of affirmative action programs somewhat vulnerable"), cert. denied, 469 U. S. 1107 (1985); *Williams* v. *New Orleans,* 729 F. 2d 1554, 1567 (CA5 1984) (en banc) (Higginbotham, J., concurring specially); *South Florida Chapter of Associated General Contractors of America, Inc.* v. *Metropolitan Dade County, Fla.,* 723 F. 2d 846, 851 (CA11), cert. denied, 469 U. S. 871 (1984).

The Court resolved the issue, at least in part, in 1989. *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469 (1989), concerned a

city's determination that 30% of its contracting work should go to minority-owned businesses. A majority of the Court in *Croson* held that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification," and that the single standard of review for racial classifications should be "strict scrutiny." *Id.*, at 493–494 (opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and White and KENNEDY, JJ.); *id.*, at 520 (SCALIA, J., concurring in judgment) ("I agree . . . with JUSTICE O'CONNOR's conclusion that strict scrutiny must be applied to all governmental classification by race"). As to the classification before the Court, the plurality agreed that "a state or local subdivision . . . has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction," *id.*, at 491–492, but the Court thought that the city had not acted with "a 'strong basis in evidence for its conclusion that remedial action was necessary,'" *id.*, at 500 (majority opinion) (quoting *Wygant, supra,* at 277 (plurality opinion)). The Court also thought it "obvious that [the] program is not narrowly tailored to remedy the effects of prior discrimination." 488 U. S., at 508.

With *Croson*, the Court finally agreed that the Fourteenth Amendment requires strict scrutiny of all race-based action by state and local governments. But *Croson* of course had no occasion to declare what standard of review the Fifth Amendment requires for such action taken by the Federal Government. *Croson* observed simply that the Court's "treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here," because *Croson*'s facts did not implicate Congress' broad power under § 5 of the Fourteenth Amendment. *Id.*, at 491 (plurality opinion); see also *id.*, at 522 (SCALIA, J., concurring in judgment) ("[W]ithout revisiting what we held in *Fullilove* . . . , I do not believe our decision in that case controls the one before us here"). On the other hand, the Court subsequently indicated that *Croson* had at least some bearing on federal race-based ac-

tion when it vacated a decision upholding such action and remanded for further consideration in light of *Croson*. *H. K. Porter Co.* v. *Metropolitan Dade County*, 489 U. S. 1062 (1989); see also *Shurberg Broadcasting of Hartford, Inc.* v. *FCC*, 876 F. 2d 902, 915, n. 16 (CADC 1989) (opinion of Silberman, J.) (noting the Court's action in *H. K. Porter Co.*), rev'd *sub nom. Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990). Thus, some uncertainty persisted with respect to the standard of review for federal racial classifications. See, *e. g., Mann* v. *Albany*, 883 F. 2d 999, 1006 (CA11 1989) (*Croson* "may be applicable to race-based classifications imposed by Congress"); *Shurberg*, 876 F. 2d, at 910 (noting the difficulty of extracting general principles from the Court's fractured opinions); *id.,* at 959 (Wald, J., dissenting from denial of rehearing en banc) ("*Croson* certainly did not resolve the substantial questions posed by congressional programs which mandate the use of racial preferences"); *Winter Park Communications, Inc.* v. *FCC*, 873 F. 2d 347, 366 (CADC 1989) (Williams, J., concurring in part and dissenting in part) ("The unresolved ambiguity of *Fullilove* and *Croson* leaves it impossible to reach a firm opinion as to the evidence of discrimination needed to sustain a congressional mandate of racial preferences"), aff'd *sub nom. Metro Broadcasting, supra.*

Despite lingering uncertainty in the details, however, the Court's cases through *Croson* had established three general propositions with respect to governmental racial classifications. First, skepticism: " 'Any preference based on racial or ethnic criteria must necessarily receive a most searching examination,' " *Wygant*, 476 U. S., at 273 (plurality opinion of Powell, J.); *Fullilove*, 448 U. S., at 491 (opinion of Burger, C. J.); see also *id.,* at 523 (Stewart, J., dissenting) ("[A]ny official action that treats a person differently on account of his race or ethnic origin is inherently suspect"); *McLaughlin*, 379 U. S., at 192 ("[R]acial classifications [are] 'constitutionally suspect' "); *Hirabayashi*, 320 U. S., at 100 ("Distinctions

between citizens solely because of their ancestry are by their very nature odious to a free people"). Second, consistency: "[T]he standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification," *Croson*, 488 U. S., at 494 (plurality opinion); *id.*, at 520 (SCALIA, J., concurring in judgment); see also *Bakke*, 438 U. S., at 289–290 (opinion of Powell, J.), *i. e.*, all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized. And third, congruence: "Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment," *Buckley* v. *Valeo*, 424 U. S., at 93; see also *Weinberger* v. *Wiesenfeld*, 420 U. S., at 638, n. 2; *Bolling* v. *Sharpe*, 347 U. S., at 500. Taken together, these three propositions lead to the conclusion that any person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny. Justice Powell's defense of this conclusion bears repeating here:

> "If it is the individual who is entitled to judicial protection against classifications based upon his racial or ethnic background because such distinctions impinge upon personal rights, rather than the individual only because of his membership in a particular group, then constitutional standards may be applied consistently. Political judgments regarding the necessity for the particular classification may be weighed in the constitutional balance, *[Korematsu]*, but the standard of justification will remain constant. This is as it should be, since those political judgments are the product of rough compromise struck by contending groups within the democratic process. When they touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling

governmental interest. The Constitution guarantees that right to every person regardless of his background. *Shelley* v. *Kraemer*, 334 U. S. [1, 22 (1948)]." *Bakke*, *supra*, at 299 (opinion of Powell, J.) (footnote omitted).

A year later, however, the Court took a surprising turn. *Metro Broadcasting, Inc.* v. *FCC*, *supra*, involved a Fifth Amendment challenge to two race-based policies of the Federal Communications Commission (FCC). In *Metro Broadcasting*, the Court repudiated the long-held notion that "it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government" than it does on a State to afford equal protection of the laws, *Bolling*, *supra*, at 500. It did so by holding that "benign" federal racial classifications need only satisfy intermediate scrutiny, even though *Croson* had recently concluded that such classifications enacted by a State must satisfy strict scrutiny. "[B]enign" federal racial classifications, the Court said, "—even if those measures are not 'remedial' in the sense of being designed to compensate victims of past governmental or societal discrimination—are constitutionally permissible to the extent that they serve *important* governmental objectives within the power of Congress and are *substantially related* to achievement of those objectives." *Metro Broadcasting*, 497 U. S., at 564–565 (emphasis added). The Court did not explain how to tell whether a racial classification should be deemed "benign," other than to express "confiden[ce] that an 'examination of the legislative scheme and its history' will separate benign measures from other types of racial classifications." *Id.*, at 564, n. 12 (citation omitted). Applying this test, the Court first noted that the FCC policies at issue did not serve as a remedy for past discrimination. *Id.*, at 566. Proceeding on the assumption that the policies were nonetheless "benign," it concluded that they served the "important governmental objective" of "enhancing broadcast diversity," *id.*, at 566–567, and that they were

"substantially related" to that objective, *id.*, at 569. It therefore upheld the policies.

By adopting intermediate scrutiny as the standard of review for congressionally mandated "benign" racial classifications, *Metro Broadcasting* departed from prior cases in two significant respects. First, it turned its back on *Croson*'s explanation of why strict scrutiny of all governmental racial classifications is essential:

> "Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Croson, supra,* at 493 (plurality opinion of O'CONNOR, J.).

We adhere to that view today, despite the surface appeal of holding "benign" racial classifications to a lower standard, because "it may not always be clear that a so-called preference is in fact benign," *Bakke, supra,* at 298 (opinion of Powell, J.). "[M]ore than good motives should be required when government seeks to allocate its resources by way of an explicit racial classification system." Days, Fullilove, 96 Yale L. J. 453, 485 (1987).

Second, *Metro Broadcasting* squarely rejected one of the three propositions established by the Court's earlier equal protection cases, namely, congruence between the standards applicable to federal and state racial classifications, and in so doing also undermined the other two—skepticism of all racial

classifications and consistency of treatment irrespective of the race of the burdened or benefited group. See *supra*, at 223–224. Under *Metro Broadcasting*, certain racial classifications ("benign" ones enacted by the Federal Government) should be treated less skeptically than others; and the race of the benefited group is critical to the determination of which standard of review to apply. *Metro Broadcasting* was thus a significant departure from much of what had come before it.

The three propositions undermined by *Metro Broadcasting* all derive from the basic principle that the Fifth and Fourteenth Amendments to the Constitution protect *persons*, not *groups*. It follows from that principle that all governmental action based on race—a *group* classification long recognized as "in most circumstances irrelevant and therefore prohibited," *Hirabayashi*, 320 U. S., at 100—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed. These ideas have long been central to this Court's understanding of equal protection, and holding "benign" state and federal racial classifications to different standards does not square with them. "[A] free people whose institutions are founded upon the doctrine of equality," *ibid.*, should tolerate no retreat from the principle that government may treat people differently because of their race only for the most compelling reasons. Accordingly, we hold today that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny. In other words, such classifications are constitutional only if they are narrowly tailored measures that further compelling governmental interests. To the extent that *Metro Broadcasting* is inconsistent with that holding, it is overruled.

In dissent, JUSTICE STEVENS criticizes us for "deliver[ing] a disconcerting lecture about the evils of governmental racial classifications," *post*, at 242. With respect, we believe his criticisms reflect a serious misunderstanding of our opinion.

JUSTICE STEVENS concurs in our view that courts should take a skeptical view of all governmental racial classifications. *Ibid.* He also allows that "[n]othing is inherently wrong with applying a single standard to fundamentally different situations, as long as that standard takes relevant differences into account." *Post*, at 246. What he fails to recognize is that strict scrutiny *does* take "relevant differences" into account—indeed, that is its fundamental purpose. The point of carefully examining the interest asserted by the government in support of a racial classification, and the evidence offered to show that the classification is needed, is precisely to distinguish legitimate from illegitimate uses of race in governmental decisionmaking. See *supra*, at 226. And JUSTICE STEVENS concedes that "some cases may be difficult to classify," *post*, at 245, and n. 4; all the more reason, in our view, to examine all racial classifications carefully. Strict scrutiny does not "trea[t] dissimilar race-based decisions as though they were equally objectionable," *post*, at 245; to the contrary, it evaluates carefully all governmental race-based decisions *in order to decide* which are constitutionally objectionable and which are not. By requiring strict scrutiny of racial classifications, we require courts to make sure that a governmental classification based on race, which "so seldom provide[s] a relevant basis for disparate treatment," *Fullilove*, 448 U. S., at 534 (STEVENS, J., dissenting), is legitimate, before permitting unequal treatment based on race to proceed.

JUSTICE STEVENS chides us for our "supposed inability to differentiate between 'invidious' and 'benign' discrimination," because it is in his view sufficient that "people understand the difference between good intentions and bad." *Post*, at 245. But, as we have just explained, the point of strict scrutiny is to "differentiate between" permissible and impermissible governmental use of race. And JUSTICE STEVENS himself has already explained in his dissent in *Fullilove* why "good intentions" alone are not enough to sustain

a supposedly "benign" racial classification: "[E]ven though it is not the actual predicate for this legislation, a statute of this kind inevitably is perceived by many as resting on an assumption that those who are granted this special preference are less qualified in some respect that is identified purely by their race. Because that perception—*especially when fostered by the Congress of the United States*—can only exacerbate rather than reduce racial prejudice, it will delay the time when race will become a truly irrelevant, or at least insignificant, factor. *Unless Congress clearly articulates the need and basis for a racial classification, and also tailors the classification to its justification,* the Court should not uphold this kind of statute." *Fullilove,* 448 U. S., at 545 (dissenting opinion) (emphasis added; footnote omitted); see also *id.,* at 537 ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification"); *Croson,* 488 U. S., at 516–517 (STEVENS, J., concurring in part and concurring in judgment) ("Although [the legislation at issue] stigmatizes the disadvantaged class with the unproven charge of past racial discrimination, it actually imposes a greater stigma on its supposed beneficiaries"); *supra,* at 226; but cf. *post,* at 245–246 (STEVENS, J., dissenting). These passages make a persuasive case for requiring strict scrutiny of congressional racial classifications.

Perhaps it is not the standard of strict scrutiny itself, but our use of the concepts of "consistency" and "congruence" in conjunction with it, that leads JUSTICE STEVENS to dissent. According to JUSTICE STEVENS, our view of consistency "equate[s] remedial preferences with invidious discrimination," *post,* at 246, and ignores the difference between "an engine of oppression" and an effort "to foster equality in society," or, more colorfully, "between a 'No Trespassing' sign and a welcome mat," *post,* at 243, 245. It does nothing of the kind. The principle of consistency simply means that whenever the government treats any person unequally be-

cause of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection. It says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny. The principle of consistency explains the circumstances in which the injury requiring strict scrutiny occurs. The application of strict scrutiny, in turn, determines whether a compelling governmental interest justifies the infliction of that injury.

Consistency *does* recognize that any individual suffers an injury when he or she is disadvantaged by the government because of his or her race, whatever that race may be. This Court clearly stated that principle in *Croson,* see 488 U. S., at 493–494 (plurality opinion); *id.,* at 520–521 (SCALIA, J., concurring in judgment); see also *Shaw* v. *Reno,* 509 U. S. 630, 643 (1993); *Powers* v. *Ohio,* 499 U. S. 400, 410 (1991). JUSTICE STEVENS does not explain how his views square with *Croson,* or with the long line of cases understanding equal protection as a personal right.

JUSTICE STEVENS also claims that we have ignored any difference between federal and state legislatures. But requiring that Congress, like the States, enact racial classifications only when doing so is necessary to further a "compelling interest" does not contravene any principle of appropriate respect for a coequal branch of the Government. It is true that various Members of this Court have taken different views of the authority §5 of the Fourteenth Amendment confers upon Congress to deal with the problem of racial discrimination, and the extent to which courts should defer to Congress' exercise of that authority. See, *e. g., Metro Broadcasting,* 497 U. S., at 605–606 (O'CONNOR, J., dissenting); *Croson,* 488 U. S., at 486–493 (opinion of O'CONNOR, J., joined by REHNQUIST, C. J., and White, J.); *id.,* at 518–519 (KENNEDY, J., concurring in part and concurring in judgment); *id.,* at 521–524 (SCALIA, J., concurring in judgment); *Fullilove,* 448 U. S., at 472–473 (opinion of Burger,

C. J.); *id.*, at 500–502, and nn. 2–3, 515, and n. 14 (Powell, J., concurring); *id.*, at 526–527 (Stewart, J., dissenting). We need not, and do not, address these differences today. For now, it is enough to observe that JUSTICE STEVENS' suggestion that any Member of this Court has repudiated in this case his or her previously expressed views on the subject, *post*, at 249–253, 256–257, is incorrect.

## C

"Although adherence to precedent is not rigidly required in constitutional cases, any departure from the doctrine of *stare decisis* demands special justification." *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984). In deciding whether this case presents such justification, we recall Justice Frankfurter's admonition that "*stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Helvering* v. *Hallock*, 309 U. S. 106, 119 (1940). Remaining true to an "intrinsically sounder" doctrine established in prior cases better serves the values of *stare decisis* than would following a more recently decided case inconsistent with the decisions that came before it; the latter course would simply compound the recent error and would likely make the unjustified break from previously established doctrine complete. In such a situation, "special justification" exists to depart from the recently decided case.

As we have explained, *Metro Broadcasting* undermined important principles of this Court's equal protection jurisprudence, established in a line of cases stretching back over 50 years, see *supra*, at 213–225. Those principles together stood for an "embracing" and "intrinsically soun[d]" understanding of equal protection "verified by experience," namely, that the Constitution imposes upon federal, state, and local governmental actors the same obligation to respect

the personal right to equal protection of the laws. This case therefore presents precisely the situation described by Justice Frankfurter in *Helvering:* We cannot adhere to our most recent decision without colliding with an accepted and established doctrine. We also note that *Metro Broadcasting*'s application of different standards of review to federal and state racial classifications has been consistently criticized by commentators. See, *e. g.*, Fried, *Metro Broadcasting, Inc. v. FCC*: Two Concepts of Equality, 104 Harv. L. Rev. 107, 113–117 (1990) (arguing that *Metro Broadcasting*'s adoption of different standards of review for federal and state racial classifications placed the law in an "unstable condition," and advocating strict scrutiny across the board); Comment, *Metro Broadcasting, Inc. v. FCC*: Requiem for a Heavyweight, 69 Texas L. Rev. 125, 145–146 (1990) (same); Linder, Review of Affirmative Action After *Metro Broadcasting v. FCC:* The Solution Almost Nobody Wanted, 59 UMKC L. Rev. 293, 297, 316–317 (1991) (criticizing "anomalous results as exemplified by the two different standards of review"); Katz, Public Affirmative Action and the Fourteenth Amendment: The Fragmentation of Theory After *Richmond v. J. A. Croson Co.* and *Metro Broadcasting, Inc. v. Federal Communications Commission*, 17 T. Marshall L. Rev. 317, 319, 354–355, 357 (1992) (arguing that "the current fragmentation of doctrine must be seen as a dangerous and seriously flawed approach to constitutional interpretation," and advocating intermediate scrutiny across the board).

Our past practice in similar situations supports our action today. In *United States* v. *Dixon*, 509 U. S. 688 (1993), we overruled the recent case of *Grady* v. *Corbin*, 495 U. S. 508 (1990), because *Grady* "lack[ed] constitutional roots" and was "wholly inconsistent with earlier Supreme Court precedent." *Dixon, supra*, at 704, 712. In *Solorio* v. *United States*, 483 U. S. 435 (1987), we overruled *O'Callahan* v. *Parker*, 395 U. S. 258 (1969), which had caused "confusion" and had rejected "an unbroken line of decisions from 1866 to 1960." *So-*

*lorio, supra,* at 439–441, 450–451. And in *Continental T. V., Inc.* v. *GTE Sylvania Inc.,* 433 U. S. 36 (1977), we overruled *United States* v. *Arnold, Schwinn & Co.,* 388 U. S. 365 (1967), which was "an abrupt and largely unexplained departure" from precedent, and of which "[t]he great weight of scholarly opinion ha[d] been critical." *Continental T. V., supra,* at 47–48, 58. See also, *e. g., Payne* v. *Tennessee,* 501 U. S. 808, 830 (1991) (overruling *Booth* v. *Maryland,* 482 U. S. 496 (1987), and *South Carolina* v. *Gathers,* 490 U. S. 805 (1989)); *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S. 658, 695–701 (1978) (partially overruling *Monroe* v. *Pape,* 365 U. S. 167 (1961), because *Monroe* was a "departure from prior practice" that had not engendered substantial reliance); *Swift & Co.* v. *Wickham,* 382 U. S. 111, 128–129 (1965) (overruling *Kesler* v. *Department of Public Safety of Utah,* 369 U. S. 153 (1962), to reaffirm "pre-*Kesler* precedent" and restore the law to the "view . . . which this Court has traditionally taken" in older cases).

It is worth pointing out the difference between the applications of *stare decisis* in this case and in *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). *Casey* explained how considerations of *stare decisis* inform the decision whether to overrule a long-established precedent that has become integrated into the fabric of the law. Overruling precedent of that kind naturally may have consequences for "the ideal of the rule of law," *id.,* at 854. In addition, such precedent is likely to have engendered substantial reliance, as was true in *Casey* itself, *id.,* at 856 ("[F]or two decades of economic and social developments, people have organized intimate relationships and made choices that define their views of themselves and their places in society, in reliance on the availability of abortion in the event that contraception should fail"). But in this case, as we have explained, we do not face a precedent of that kind, because *Metro Broadcasting* itself *departed* from our prior cases—and did so quite recently. By refusing to follow

*Metro Broadcasting*, then, we do not depart from the fabric of the law; we restore it. We also note that reliance on a case that has recently departed from precedent is likely to be minimal, particularly where, as here, the rule set forth in that case is unlikely to affect primary conduct in any event. Cf. *Allied-Bruce Terminix Cos.* v. *Dobson*, 513 U. S. 265, 272 (1995) (declining to overrule *Southland Corp.* v. *Keating*, 465 U. S. 1 (1984), where "private parties have likely written contracts relying upon *Southland* as authority" in the 10 years since *Southland* was decided).

JUSTICE STEVENS takes us to task for what he perceives to be an erroneous application of the doctrine of *stare decisis*. But again, he misunderstands our position. We have acknowledged that, after *Croson*, "some uncertainty persisted with respect to the standard of review for federal racial classifications," *supra*, at 223, and we therefore do not say that we "merely restor[e] the *status quo ante*" today, *post*, at 257. But as we have described *supra*, at 213–227, we think that well-settled legal principles pointed toward a conclusion different from that reached in *Metro Broadcasting*, and we therefore disagree with JUSTICE STEVENS that "the law at the time of that decision was entirely open to the result the Court reached," *post*, at 257. We also disagree with JUSTICE STEVENS that Justice Stewart's dissenting opinion in *Fullilove* supports his "novelty" argument, see *post*, at 258–259, and n. 13. Justice Stewart said that "[u]nder our Constitution, any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid," and that "'[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.'" *Fullilove*, 448 U. S., at 523, and n. 1. He took the view that "[t]he hostility of the Constitution to racial classifications by government has been manifested in many cases decided by this Court," and that "our cases have made clear that the Constitution is

wholly neutral in forbidding such racial discrimination, whatever the race may be of those who are its victims." *Id.*, at 524. Justice Stewart gave no indication that he thought he was addressing a "novel" proposition, *post*, at 259. Rather, he relied on the fact that the text of the Fourteenth Amendment extends its guarantee to "persons," and on cases like *Buckley, Loving, McLaughlin, Bolling, Hirabayashi,* and *Korematsu*, see *Fullilove, supra*, at 524–526, as do we today. There is nothing new about the notion that Congress, like the States, may treat people differently because of their race only for compelling reasons.

"The real problem," Justice Frankfurter explained, "is whether a principle shall prevail over its later misapplications." *Helvering*, 309 U. S., at 122. *Metro Broadcasting*'s untenable distinction between state and federal racial classifications lacks support in our precedent, and undermines the fundamental principle of equal protection as a personal right. In this case, as between that principle and "its later misapplications," the principle must prevail.

## D

Our action today makes explicit what Justice Powell thought implicit in the *Fullilove* lead opinion: Federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest. See *Fullilove*, 448 U. S., at 496 (concurring opinion). (Recall that the lead opinion in *Fullilove* "d[id] not adopt . . . the formulas of analysis articulated in such cases as *[Bakke]*." *Id.*, at 492 (opinion of Burger, C. J.).) Of course, it follows that to the extent (if any) that *Fullilove* held federal racial classifications to be subject to a less rigorous standard, it is no longer controlling. But we need not decide today whether the program upheld in *Fullilove* would survive strict scrutiny as our more recent cases have defined it.

Some have questioned the importance of debating the proper standard of review of race-based legislation. See, *e. g., post,* at 247 (STEVENS, J., dissenting); *Croson,* 488 U. S., at 514–515, and n. 5 (STEVENS, J., concurring in part and concurring in judgment); cf. *Metro Broadcasting,* 497 U. S., at 610 (O'CONNOR, J., dissenting) ("This dispute regarding the appropriate standard of review may strike some as a lawyers' quibble over words"). But we agree with JUSTICE STEVENS that, "[b]ecause racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate," and that "[r]acial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Fullilove, supra,* at 533–535, 537 (dissenting opinion) (footnotes omitted). We think that requiring strict scrutiny is the best way to ensure that courts will consistently give racial classifications that kind of detailed examination, both as to ends and as to means. *Korematsu* demonstrates vividly that even "the most rigid scrutiny" can sometimes fail to detect an illegitimate racial classification, compare *Korematsu,* 323 U. S., at 223 ("To cast this case into outlines of racial prejudice, without reference to the real military dangers which were presented, merely confuses the issue. Korematsu was not excluded from the Military Area because of hostility to him or his race"), with Pub. L. 100–383, § 2(a), 102 Stat. 903–904 ("[T]hese actions [of relocating and interning civilians of Japanese ancestry] were carried out without adequate security reasons . . . and were motivated largely by racial prejudice, wartime hysteria, and a failure of political leadership"). Any retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.

Finally, we wish to dispel the notion that strict scrutiny is "strict in theory, but fatal in fact." *Fullilove, supra,* at 519 (Marshall, J., concurring in judgment). The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it. As recently as 1987, for example, every Justice of this Court agreed that the Alabama Department of Public Safety's "pervasive, systematic, and obstinate discriminatory conduct" justified a narrowly tailored race-based remedy. See *United States* v. *Paradise,* 480 U. S., at 167 (plurality opinion of Brennan, J.); *id.,* at 190 (STEVENS, J., concurring in judgment); *id.,* at 196 (O'CONNOR, J., dissenting). When race-based action is necessary to further a compelling interest, such action is within constitutional constraints if it satisfies the "narrow tailoring" test this Court has set out in previous cases.

## IV

Because our decision today alters the playing field in some important respects, we think it best to remand the case to the lower courts for further consideration in light of the principles we have announced. The Court of Appeals, following *Metro Broadcasting* and *Fullilove,* analyzed the case in terms of intermediate scrutiny. It upheld the challenged statutes and regulations because it found them to be "narrowly tailored to achieve [their] *significant governmental purpose* of providing subcontracting opportunities for small disadvantaged business enterprises." 16 F. 3d, at 1547 (emphasis added). The Court of Appeals did not decide the question whether the interests served by the use of subcontractor compensation clauses are properly described as "compelling." It also did not address the question of narrow tailoring in terms of our strict scrutiny cases, by asking, for example, whether there was "any consideration of the use of

race-neutral means to increase minority business participation" in government contracting, *Croson, supra,* at 507, or whether the program was appropriately limited such that it "will not last longer than the discriminatory effects it is designed to eliminate," *Fullilove, supra,* at 513 (Powell, J., concurring).

Moreover, unresolved questions remain concerning the details of the complex regulatory regimes implicated by the use of subcontractor compensation clauses. For example, the SBA's 8(a) program requires an individualized inquiry into the economic disadvantage of every participant, see 13 CFR § 124.106(a) (1994), whereas the DOT's regulations implementing STURAA § 106(c) do *not* require certifying authorities to make such individualized inquiries, see 49 CFR § 23.62 (1994); 49 CFR pt. 23, subpt. D, App. C (1994). And the regulations seem unclear as to whether 8(d) subcontractors must make individualized showings, or instead whether the race-based presumption applies both to social *and* economic disadvantage, compare 13 CFR § 124.106(b) (1994) (apparently requiring 8(d) participants to make an individualized showing), with 48 CFR § 19.703(a)(2) (1994) (apparently allowing 8(d) subcontractors to invoke the race-based presumption for social and economic disadvantage). See generally Part I, *supra.* We also note an apparent discrepancy between the definitions of which socially disadvantaged individuals qualify as economically disadvantaged for the 8(a) and 8(d) programs; the former requires a showing that such individuals' ability to compete has been impaired "as compared to others in the same or similar line of business *who are not socially disadvantaged,*" 13 CFR § 124.106(a)(1)(i) (1994) (emphasis added), while the latter requires that showing only "as compared to others in the same or similar line of business," § 124.106(b)(1). The question whether any of the ways in which the Government uses subcontractor compensation clauses can survive strict scrutiny, and any relevance distinctions such as these may have to that ques-

tion, should be addressed in the first instance by the lower courts.

Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join the opinion of the Court, except Part III–C, and except insofar as it may be inconsistent with the following: In my view, government can never have a "compelling interest" in discriminating on the basis of race in order to "make up" for past racial discrimination in the opposite direction. See *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 520 (1989) (SCALIA, J., concurring in judgment). Individuals who have been wronged by unlawful racial discrimination should be made whole; but under our Constitution there can be no such thing as either a creditor or a debtor race. That concept is alien to the Constitution's focus upon the individual, see Amdt. 14, § 1 ("[N]or shall any State . . . deny *to any person*" the equal protection of the laws) (emphasis added), and its rejection of dispositions based on race, see Amdt. 15, § 1 (prohibiting abridgment of the right to vote "on account of race"), or based on blood, see Art. III, § 3 ("[N]o Attainder of Treason shall work Corruption of Blood"); Art. I, § 9, cl. 8 ("No Title of Nobility shall be granted by the United States"). To pursue the concept of racial entitlement—even for the most admirable and benign of purposes—is to reinforce and preserve for future mischief the way of thinking that produced race slavery, race privilege and race hatred. In the eyes of government, we are just one race here. It is American.

It is unlikely, if not impossible, that the challenged program would survive under this understanding of strict scrutiny, but I am content to leave that to be decided on remand.

JUSTICE THOMAS, concurring in part and concurring in the judgment.

I agree with the majority's conclusion that strict scrutiny applies to *all* government classifications based on race. I write separately, however, to express my disagreement with the premise underlying JUSTICE STEVENS' and JUSTICE GINSBURG's dissents: that there is a racial paternalism exception to the principle of equal protection. I believe that there is a "moral [and] constitutional equivalence," *post*, at 243 (STEVENS, J., dissenting), between laws designed to subjugate a race and those that distribute benefits on the basis of race in order to foster some current notion of equality. Government cannot make us equal; it can only recognize, respect, and protect us as equal before the law.

That these programs may have been motivated, in part, by good intentions cannot provide refuge from the principle that under our Constitution, the government may not make distinctions on the basis of race. As far as the Constitution is concerned, it is irrelevant whether a government's racial classifications are drawn by those who wish to oppress a race or by those who have a sincere desire to help those thought to be disadvantaged. There can be no doubt that the paternalism that appears to lie at the heart of this program is at war with the principle of inherent equality that underlies and infuses our Constitution. See Declaration of Independence ("We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty, and the pursuit of Happiness").

These programs not only raise grave constitutional questions, they also undermine the moral basis of the equal protection principle. Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that such classifications ultimately have a destructive impact on the individual and our society. Unquestionably, "[i]nvidious [racial] discrimination is an en-

gine of oppression," *post*, at 243 (STEVENS, J., dissenting). It is also true that "[r]emedial" racial preferences may reflect "a desire to foster equality in society," *ibid.* But there can be no doubt that racial paternalism and its unintended consequences can be as poisonous and pernicious as any other form of discrimination. So-called "benign" discrimination teaches many that because of chronic and apparently immutable handicaps, minorities cannot compete with them without their patronizing indulgence. Inevitably, such programs engender attitudes of superiority or, alternatively, provoke resentment among those who believe that they have been wronged by the government's use of race. These programs stamp minorities with a badge of inferiority and may cause them to develop dependencies or to adopt an attitude that they are "entitled" to preferences. Indeed, JUSTICE STEVENS once recognized the real harms stemming from seemingly "benign" discrimination. See *Fullilove* v. *Klutznick*, 448 U. S. 448, 545 (1980) (STEVENS, J., dissenting) (noting that "remedial" race legislation "is perceived by many as resting on an assumption that those who are granted this special preference are less qualified in some respect that is identified purely by their race").

In my mind, government-sponsored racial discrimination based on benign prejudice is just as noxious as discrimination inspired by malicious prejudice.\* In each instance, it is racial discrimination, plain and simple.

---

\*It should be obvious that every racial classification helps, in a narrow sense, some races and hurts others. As to the races benefited, the classification could surely be called "benign." Accordingly, whether a law relying upon racial taxonomy is "benign" or "malign," *post*, at 275 (GINSBURG, J., dissenting); see also *post*, at 247 (STEVENS, J., dissenting) (addressing differences between "invidious" and "benign" discrimination), either turns on " 'whose ox is gored,' " *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 295, n. 35 (1978) (Powell, J.) (quoting, A. Bickel, The Morality of Consent 133 (1975)), or on distinctions found only in the eye of the beholder.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

Instead of deciding this case in accordance with controlling precedent, the Court today delivers a disconcerting lecture about the evils of governmental racial classifications. For its text the Court has selected three propositions, represented by the bywords "skepticism," "consistency," and "congruence." See *ante*, at 223–224. I shall comment on each of these propositions, then add a few words about *stare decisis*, and finally explain why I believe this Court has a duty to affirm the judgment of the Court of Appeals.

## I

The Court's concept of skepticism is, at least in principle, a good statement of law and of common sense. Undoubtedly, a court should be wary of a governmental decision that relies upon a racial classification. "Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic," a reviewing court must satisfy itself that the reasons for any such classification are "clearly identified and unquestionably legitimate." *Fullilove* v. *Klutznick,* 448 U. S. 448, 533–535 (1980) (STEVENS, J., dissenting). This principle is explicit in Chief Justice Burger's opinion, *id.*, at 480; in Justice Powell's concurrence, *id.*, at 496; and in my dissent in *Fullilove, id.*, at 533–534. I welcome its renewed endorsement by the Court today. But, as the opinions in *Fullilove* demonstrate, substantial agreement on the standard to be applied in deciding difficult cases does not necessarily lead to agreement on how those cases actually should or will be resolved. In my judgment, because uniform standards are often anything but uniform, we should evaluate the Court's comments on "consistency," "congruence," and *stare decisis* with the same type of skepticism that the Court advocates for the underlying issue.

## II

The Court's concept of "consistency" assumes that there is no significant difference between a decision by the majority to impose a special burden on the members of a minority race and a decision by the majority to provide a benefit to certain members of that minority notwithstanding its incidental burden on some members of the majority. In my opinion that assumption is untenable. There is no moral or constitutional equivalence between a policy that is designed to perpetuate a caste system and one that seeks to eradicate racial subordination. Invidious discrimination is an engine of oppression, subjugating a disfavored group to enhance or maintain the power of the majority. Remedial race-based preferences reflect the opposite impulse: a desire to foster equality in society. No sensible conception of the Government's constitutional obligation to "govern impartially," *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976), should ignore this distinction.[1]

---

[1] As JUSTICE GINSBURG observes, *post*, at 275–276, the majority's "flexible" approach to "strict scrutiny" may well take into account differences between benign and invidious programs. The majority specifically notes that strict scrutiny can accommodate " 'relevant differences,' " *ante*, at 228; surely the intent of a government actor and the effects of a program are relevant to its constitutionality. See *Missouri* v. *Jenkins*, *ante*, at 112 (O'CONNOR, J., concurring) ("[T]ime and again, we have recognized the ample authority legislatures possess to combat racial injustice . . . . It is only by applying strict scrutiny that we can distinguish between unconstitutional discrimination and narrowly tailored remedial programs that legislatures may enact to further the compelling governmental interest in redressing the effects of past discrimination").

Even if this is so, however, I think it is unfortunate that the majority insists on applying the label "strict scrutiny" to benign race-based programs. That label has usually been understood to spell the death of any governmental action to which a court may apply it. The Court suggests today that "strict scrutiny" means something different—something less strict—when applied to benign racial classifications. Although I agree that benign programs deserve different treatment than invidious programs, there is a danger that the fatal language of "strict scrutiny" will

To illustrate the point, consider our cases addressing the Federal Government's discrimination against Japanese-Americans during World War II, *Hirabayashi* v. *United States*, 320 U. S. 81 (1943), and *Korematsu* v. *United States*, 323 U. S. 214 (1944). The discrimination at issue in those cases was invidious because the Government imposed special burdens—a curfew and exclusion from certain areas on the West Coast[2]—on the members of a minority class defined by racial and ethnic characteristics. Members of the same racially defined class exhibited exceptional heroism in the service of our country during that war. Now suppose Congress decided to reward that service with a federal program that gave all Japanese-American veterans an extraordinary preference in Government employment. Cf. *Personnel Administrator of Mass.* v. *Feeney*, 442 U. S. 256 (1979). If Congress had done so, the same racial characteristics that motivated the discriminatory burdens in *Hirabayashi* and *Korematsu* would have defined the preferred class of veterans. Nevertheless, "consistency" surely would not require us to describe the incidental burden on everyone else in the country as "odious" or "invidious" as those terms were used in those cases. We should reject a concept of "consistency" that would view the special preferences that the National Government has provided to Native Americans since 1834[3]

---

skew the analysis and place well-crafted benign programs at unnecessary risk.

[2] These were, of course, neither the sole nor the most shameful burdens the Government imposed on Japanese-Americans during that War. They were, however, the only such burdens this Court had occasion to address in *Hirabayashi* and *Korematsu*. See *Korematsu*, 323 U. S., at 223 ("Regardless of the true nature of the assembly and relocation centers . . . we are dealing specifically with nothing but an exclusion order").

[3] See *Morton* v. *Mancari*, 417 U. S. 535, 541 (1974). To be eligible for the preference in 1974, an individual had to "'be one fourth or more degree Indian blood and be a member of a Federally-recognized tribe.'" *Id.*, at 553, n. 24, quoting 44 BIAM 335, 3.1 (1972). We concluded that the classi-

as comparable to the official discrimination against African-Americans that was prevalent for much of our history.

The consistency that the Court espouses would disregard the difference between a "No Trespassing" sign and a welcome mat. It would treat a Dixiecrat Senator's decision to vote against Thurgood Marshall's confirmation in order to keep African-Americans off the Supreme Court as on a par with President Johnson's evaluation of his nominee's race as a positive factor. It would equate a law that made black citizens ineligible for military service with a program aimed at recruiting black soldiers. An attempt by the majority to exclude members of a minority race from a regulated market is fundamentally different from a subsidy that enables a relatively small group of newcomers to enter that market. An interest in "consistency" does not justify treating differences as though they were similarities.

The Court's explanation for treating dissimilar race-based decisions as though they were equally objectionable is a supposed inability to differentiate between "invidious" and "benign" discrimination. *Ante*, at 225–226. But the term "affirmative action" is common and well understood. Its presence in everyday parlance shows that people understand the difference between good intentions and bad. As with any legal concept, some cases may be difficult to classify,[4] but our equal protection jurisprudence has identified a critical difference between state action that imposes burdens on a

---

fication was not "racial" because it did not encompass all Native Americans. 417 U. S., at 553–554. In upholding it, we relied in part on the plenary power of Congress to legislate on behalf of Indian tribes. *Id.*, at 551–552. In this case respondents rely, in part, on the fact that not all members of the preferred minority groups are eligible for the preference, and on the special power to legislate on behalf of minorities granted to Congress by § 5 of the Fourteenth Amendment.

[4] For example, in *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989), a majority of the members of the city council that enacted the race-based set-aside were of the same race as its beneficiaries.

disfavored few and state action that benefits the few "in spite of" its adverse effects on the many. *Feeney,* 442 U. S., at 279.

Indeed, our jurisprudence has made the standard to be applied in cases of invidious discrimination turn on whether the discrimination is "intentional," or whether, by contrast, it merely has a discriminatory "effect." *Washington* v. *Davis,* 426 U. S. 229 (1976). Surely this distinction is at least as subtle, and at least as difficult to apply, see *id.,* at 253–254 (concurring opinion), as the usually obvious distinction between a measure intended to benefit members of a particular minority race and a measure intended to burden a minority race. A state actor inclined to subvert the Constitution might easily hide bad intentions in the guise of unintended "effects"; but I should think it far more difficult to enact a law intending to preserve the majority's hegemony while casting it plausibly in the guise of affirmative action for minorities.

Nothing is inherently wrong with applying a single standard to fundamentally different situations, as long as that standard takes relevant differences into account. For example, if the Court in all equal protection cases were to insist that differential treatment be justified by relevant characteristics of the members of the favored and disfavored classes that provide a legitimate basis for disparate treatment, such a standard would treat dissimilar cases differently while still recognizing that there is, after all, only one Equal Protection Clause. See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 451–455 (1985) (STEVENS, J., concurring); *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 98–110 (1973) (Marshall, J., dissenting). Under such a standard, subsidies for disadvantaged businesses may be constitutional though special taxes on such businesses would be invalid. But a single standard that purports to equate remedial preferences with invidious discrimination cannot be defended in the name of "equal protection."

Moreover, the Court may find that its new "consistency" approach to race-based classifications is difficult to square with its insistence upon rigidly separate categories for discrimination against different classes of individuals. For example, as the law currently stands, the Court will apply "intermediate scrutiny" to cases of invidious gender discrimination and "strict scrutiny" to cases of invidious race discrimination, while applying the same standard for benign classifications as for invidious ones. If this remains the law, then today's lecture about "consistency" will produce the anomalous result that the Government can more easily enact affirmative-action programs to remedy discrimination against women than it can enact affirmative-action programs to remedy discrimination against African-Americans—even though the primary purpose of the Equal Protection Clause was to end discrimination against the former slaves. See *Associated General Contractors of Cal., Inc.* v. *San Francisco*, 813 F. 2d 922 (CA9 1987) (striking down racial preference under strict scrutiny while upholding gender preference under intermediate scrutiny). When a court becomes preoccupied with abstract standards, it risks sacrificing common sense at the altar of formal consistency.

As a matter of constitutional and democratic principle, a decision by representatives of the majority to discriminate against the members of a minority race is fundamentally different from those same representatives' decision to impose incidental costs on the majority of their constituents in order to provide a benefit to a disadvantaged minority.[5]   Indeed,

---

[5] In his concurrence, JUSTICE THOMAS argues that the most significant cost associated with an affirmative-action program is its adverse stigmatic effect on its intended beneficiaries. *Ante*, at 240–241. Although I agree that this cost may be more significant than many people realize, see *Fullilove* v. *Klutznick*, 448 U. S. 448, 545 (1980) (STEVENS, J., dissenting), I do not think it applies to the facts of this case. First, this is not an argument that petitioner Adarand, a white-owned business, has standing to advance. No beneficiaries of the specific program under attack today have challenged its constitutionality—perhaps because they do not find the prefer-

as I have previously argued, the former is virtually always repugnant to the principles of a free and democratic society, whereas the latter is, in some circumstances, entirely consistent with the ideal of equality. *Wygant* v. *Jackson Bd. of Ed.*, 476 U. S. 267, 316–317 (1986) (STEVENS, J., dissenting).[6]

---

ences stigmatizing, or perhaps because their ability to opt out of the program provides them all the relief they would need. Second, even if the petitioner in this case were a minority-owned business challenging the stigmatizing effect of this program, I would not find JUSTICE THOMAS' extreme proposition—that there is a moral and constitutional equivalence between an attempt to subjugate and an attempt to redress the effects of a caste system, *ante,* at 240—at all persuasive. It is one thing to question the wisdom of affirmative-action programs: There are many responsible arguments against them, including the one based upon stigma, that Congress might find persuasive when it decides whether to enact or retain race-based preferences. It is another thing altogether to equate the many well-meaning and intelligent lawmakers and their constituents—whether members of majority or minority races—who have supported affirmative action over the years, to segregationists and bigots.

Finally, although JUSTICE THOMAS is more concerned about the potential effects of these programs than the intent of those who enacted them (a proposition at odds with this Court's jurisprudence, see *Washington* v. *Davis,* 426 U. S. 229 (1976), but not without a strong element of common sense, see *id.,* at 252–256 (STEVENS, J., concurring); *id.,* at 256–270 (Brennan, J., dissenting)), I am not persuaded that the psychological damage brought on by affirmative action is as severe as that engendered by racial subordination. That, in any event, is a judgment the political branches can be trusted to make. In enacting affirmative-action programs, a legislature intends to remove obstacles that have unfairly placed individuals of equal qualifications at a competitive disadvantage. See *Fullilove,* 448 U. S., at 521 (Marshall, J., concurring in judgment). I do not believe such action, whether wise or unwise, deserves such an invidious label as "racial paternalism," *ante,* at 240 (opinion of THOMAS, J.). If the legislature is persuaded that its program is doing more harm than good to the individuals it is designed to benefit, then we can expect the legislature to remedy the problem. Significantly, this is not true of a government action based on invidious discrimination.

[6] As I noted in *Wygant*:

"There is . . . a critical difference between a decision to *exclude* a member of a minority race because of his or her skin color and a decision

By insisting on a doctrinaire notion of "consistency" in the standard applicable to all race-based governmental actions, the Court obscures this essential dichotomy.

## III

The Court's concept of "congruence" assumes that there is no significant difference between a decision by the Congress of the United States to adopt an affirmative-action program and such a decision by a State or a municipality. In my opinion that assumption is untenable. It ignores important practical and legal differences between federal and state or local decisionmakers.

These differences have been identified repeatedly and consistently both in opinions of the Court and in separate opinions authored by Members of today's majority. Thus, in *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990), in which we upheld a federal program designed to foster racial diversity in broadcasting, we identified the special "institu-

---

to *include* more members of the minority in a school faculty for that reason.

"The exclusionary decision rests on the false premise that differences in race, or in the color of a person's skin, reflect real differences that are relevant to a person's right to share in the blessings of a free society. As noted, that premise is 'utterly irrational,' *Cleburne* v. *Cleburne Living Center*, 473 U. S. 432, 452 (1985), and repugnant to the principles of a free and democratic society. Nevertheless, the fact that persons of different races do, indeed have differently colored skin, may give rise to a belief that there is some significant difference between such persons. The inclusion of minority teachers in the educational process inevitably tends to dispel that illusion whereas their exclusion could only tend to foster it. The inclusionary decision is consistent with the principle that all men are created equal; the exclusionary decision is at war with that principle. One decision accords with the Equal Protection Clause of the Fourteenth Amendment; the other does not. Thus, consideration of whether the consciousness of race is exclusionary or inclusionary plainly distinguishes the Board's valid purpose in this case from a race-conscious decision that would reinforce assumptions of inequality." 476 U. S., at 316–317 (dissenting opinion).

tional competence" of our National Legislature. *Id.*, at 563. "It is of overriding significance in these cases," we were careful to emphasize, "that the FCC's minority ownership programs have been specifically approved—indeed, mandated—by Congress." *Ibid.* We recalled the several opinions in *Fullilove* that admonished this Court to "'approach our task with appropriate deference to the Congress, a coequal branch charged by the Constitution with the power to "provide for the . . . general Welfare of the United States" and "to enforce, by appropriate legislation," the equal protection guarantees of the Fourteenth Amendment.' [*Fullilove*, 448 U. S.], at 472; see also *id.*, at 491; *id.*, at 510, and 515–516, n. 14 (Powell, J., concurring); *id.*, at 517–520 (MARSHALL, J., concurring in judgment)." 497 U. S., at 563. We recalled that the opinions of Chief Justice Burger and Justice Powell in *Fullilove* had "explained that deference was appropriate in light of Congress' institutional competence as the National Legislature, as well as Congress' powers under the Commerce Clause, the Spending Clause, and the Civil War Amendments." 497 U. S., at 563 (citations and footnote omitted).

The majority in *Metro Broadcasting* and the plurality in *Fullilove* were not alone in relying upon a critical distinction between federal and state programs. In his separate opinion in *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469, 520–524 (1989), JUSTICE SCALIA discussed the basis for this distinction. He observed that "it is one thing to permit racially based conduct by the Federal Government—whose legislative powers concerning matters of race were explicitly enhanced by the Fourteenth Amendment, see U. S. Const., Amdt. 14, § 5—and quite another to permit it by the precise entities against whose conduct in matters of race that Amendment was specifically directed, see Amdt. 14, § 1." *Id.*, at 521–522. Continuing, JUSTICE SCALIA explained why a "sound distinction between federal and state (or local) action based on race rests not only upon the substance of the

Civil War Amendments, but upon social reality and governmental theory." *Id.*, at 522.

"What the record shows, in other words, is that racial discrimination against any group finds a more ready expression at the state and local than at the federal level. To the children of the Founding Fathers, this should come as no surprise. An acute awareness of the heightened danger of oppression from political factions in small, rather than large, political units dates to the very beginning of our national history. See G. Wood, The Creation of the American Republic, 1776–1787, pp. 499–506 (1969). As James Madison observed in support of the proposed Constitution's enhancement of national powers:

" 'The smaller the society, the fewer probably will be the distinct parties and interests composing it; the fewer the distinct parties and interests, the more frequently will a majority be found of the same party; and the smaller the number of individuals composing a majority, and the smaller the compass within which they are placed, the more easily will they concert and execute their plan of oppression. Extend the sphere and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength and to act in unison with each other.' The Federalist No. 10, pp. 82–84 (C. Rossiter ed. 1961)." *Id.*, at 523 (opinion concurring in judgment).

In her plurality opinion in *Croson*, JUSTICE O'CONNOR also emphasized the importance of this distinction when she responded to the city's argument that *Fullilove* was controlling. She wrote:

"What appellant ignores is that Congress, unlike any State or political subdivision, has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment. The power to 'enforce' may at times also include the power to define situations which *Congress* determines threaten principles of equality and to adopt prophylactic rules to deal with those situations. The Civil War Amendments themselves worked a dramatic change in the balance between congressional and state power over matters of race." 488 U. S., at 490 (joined by REHNQUIST, C. J., and White, J.) (citations omitted).

An additional reason for giving greater deference to the National Legislature than to a local lawmaking body is that federal affirmative-action programs represent the will of our entire Nation's elected representatives, whereas a state or local program may have an impact on nonresident entities who played no part in the decision to enact it. Thus, in the state or local context, individuals who were unable to vote for the local representatives who enacted a race-conscious program may nonetheless feel the effects of that program. This difference recalls the goals of the Commerce Clause, U. S. Const., Art. I, §8, cl. 3, which permits Congress to legislate on certain matters of national importance while denying power to the States in this area for fear of undue impact upon out-of-state residents. See *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 767–768, n. 2 (1945) ("[T]o the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected").

Ironically, after all of the time, effort, and paper this Court has expended in differentiating between federal and state affirmative action, the majority today virtually ignores the issue. See *ante,* at 230–231. It provides not a word of direct explanation for its sudden and enormous departure from

the reasoning in past cases. Such silence, however, cannot erase the difference between Congress' institutional competence and constitutional authority to overcome historic racial subjugation and the States' lesser power to do so.

Presumably, the majority is now satisfied that its theory of "congruence" between the substantive rights provided by the Fifth and Fourteenth Amendments disposes of the objection based upon divided constitutional powers. But it is one thing to say (as no one seems to dispute) that the Fifth Amendment encompasses a general guarantee of equal protection as broad as that contained within the Fourteenth Amendment. It is another thing entirely to say that Congress' institutional competence and constitutional authority entitles it to no greater deference when it enacts a program designed to foster equality than the deference due a state legislature.[7] The latter is an extraordinary proposition; and, as the foregoing discussion demonstrates, our precedents have rejected it explicitly and repeatedly.[8]

---

[7] Despite the majority's reliance on *Korematsu* v. *United States*, 323 U. S. 214 (1944), *ante*, at 214–215, that case does not stand for the proposition that federal remedial programs are subject to strict scrutiny. Instead, *Korematsu* specifies that "all legal restrictions *which curtail the civil rights of a single racial group* are immediately suspect." 323 U. S., at 216, quoted *ante*, at 214 (emphasis added). The programs at issue in this case (as in most affirmative-action cases) do not "curtail the civil rights of a single racial group"; they benefit certain racial groups and impose an indirect burden on the majority.

[8] We have rejected this proposition outside of the affirmative-action context as well. In *Hampton* v. *Mow Sun Wong*, 426 U. S. 88, 100 (1976), we held:

"The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both Amendments require the same type of analysis, see *Buckley* v. *Valeo*, 424 U. S. 1, 93 [(1976)], the Court of Appeals correctly stated that the two protections are not always coextensive. Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify

Our opinion in *Metro Broadcasting* relied on several constitutional provisions to justify the greater deference we owe to Congress when it acts with respect to private individuals. 497 U. S., at 563. In the programs challenged in this case, Congress has acted both with respect to private individuals and, as in *Fullilove*, with respect to the States themselves.[9] When Congress does this, it draws its power directly from § 5 of the Fourteenth Amendment.[10] That section reads:

selective federal legislation that would be unacceptable for an individual State. On the other hand, when a federal rule is applicable to only a limited territory, such as the District of Columbia, or an insular possession, and when there is no special national interest involved, the Due Process Clause has been construed as having the same significance as the Equal Protection Clause."

[9] The funding for the preferences challenged in this case comes from the Surface Transportation and Uniform Relocation Assistance Act of 1987 (STURAA), 101 Stat. 132, in which Congress has granted funds to the States in exchange for a commitment to foster subcontracting by disadvantaged business enterprises, or "DBE's." STURAA is also the source of funding for DBE preferences in federal highway contracting. Approximately 98% of STURAA's funding is allocated to the States. Brief for Respondents 38, n. 34. Moreover, under STURAA States are empowered to certify businesses as "disadvantaged" for purposes of receiving subcontracting preferences in both state and federal contracts. STURAA § 106(c)(4), 101 Stat. 146.

In this case, Adarand has sued only the federal officials responsible for implementing federal highway contracting policy; it has not directly challenged DBE preferences granted in state contracts funded by STURAA. It is not entirely clear, then, whether the majority's "congruence" rationale would apply to federally regulated state contracts, which may conceivably be within the majority's view of Congress' § 5 authority even if the federal contracts are not. See *Metro Broadcasting*, 497 U. S., at 603–604 (O'CONNOR, J., dissenting). As I read the majority's opinion, however, it draws no distinctions between direct federal preferences and federal preferences achieved through subsidies to States. The extent to which STURAA intertwines elements of direct federal regulations with elements of federal conditions on grants to the States would make such a distinction difficult to sustain.

[10] Because Congress has acted with respect to the States in enacting STURAA, we need not revisit today the difficult question of § 5's application to pure federal regulation of individuals.

"The Congress shall have power to enforce, by appropriate legislation, the provisions of this article." One of the "provisions of this article" that Congress is thus empowered to enforce reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, § 1. The Fourteenth Amendment directly empowers Congress at the same time it expressly limits the States.[11] This is no accident. It represents our Nation's consensus, achieved after hard experience throughout our sorry history of race relations, that the Federal Government must be the primary defender of racial minorities against the States, some of which may be inclined to oppress such minorities. A rule of "congruence" that ignores a purposeful "incongruity" so fundamental to our system of government is unacceptable.

In my judgment, the Court's novel doctrine of "congruence" is seriously misguided. Congressional deliberations about a matter as important as affirmative action should be accorded far greater deference than those of a State or municipality.

## IV

The Court's concept of *stare decisis* treats some of the language we have used in explaining our decisions as though it

---

[11] We have read § 5 as a positive grant of authority to Congress, not just to punish violations, but also to define and expand the scope of the Equal Protection Clause. *Katzenbach* v. *Morgan,* 384 U. S. 641 (1966). In *Katzenbach,* this meant that Congress under § 5 could require the States to allow non-English-speaking citizens to vote, even if denying such citizens a vote would not have been an independent violation of § 1. *Id.,* at 648–651. Congress, then, can expand the coverage of § 1 by exercising its power under § 5 when it acts to foster equality. Congress has done just that here; it has decided that granting certain preferences to minorities best serves the goals of equal protection.

were more important than our actual holdings. In my opinion that treatment is incorrect.

This is the third time in the Court's entire history that it has considered the constitutionality of a federal affirmative-action program. On each of the two prior occasions, the first in 1980, *Fullilove* v. *Klutznick,* 448 U. S. 448, and the second in 1990, *Metro Broadcasting, Inc.* v. *FCC,* 497 U. S. 547, the Court upheld the program. Today the Court explicitly overrules *Metro Broadcasting* (at least in part), *ante,* at 227, and undermines *Fullilove* by recasting the standard on which it rested and by calling even its holding into question, *ante,* at 235. By way of explanation, JUSTICE O'CONNOR advises the federal agencies and private parties that have made countless decisions in reliance on those cases that "we do not depart from the fabric of the law; we restore it." *Ante,* at 234. A skeptical observer might ask whether this pronouncement is a faithful application of the doctrine of *stare decisis.*[12] A brief comment on each of the two ailing cases may provide the answer.

In the Court's view, our decision in *Metro Broadcasting* was inconsistent with the rule announced in *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469 (1989). *Ante,* at 225–226. But two decisive distinctions separate those two cases. First, *Metro Broadcasting* involved a federal program, whereas *Croson* involved a city ordinance. *Metro Broadcasting* thus drew primary support from *Fullilove,* which predated *Croson* and which *Croson* distinguished on the grounds of the federal-state dichotomy that the majority today discredits. Although Members of today's majority trumpeted the importance of that distinction in *Croson,* they now reject it in the name of "congruence." It is therefore

---

[12] Our skeptical observer might also notice that JUSTICE O'CONNOR's explanation for departing from settled precedent is joined only by JUSTICE KENNEDY. *Ante,* at 204. Three Members of the majority thus provide no explanation whatsoever for their unwillingness to adhere to the doctrine of *stare decisis.*

quite wrong for the Court to suggest today that overruling *Metro Broadcasting* merely restores the *status quo ante*, for the law at the time of that decision was entirely open to the result the Court reached. *Today's* decision is an unjustified departure from settled law.

Second, *Metro Broadcasting's* holding rested on more than its application of "intermediate scrutiny." Indeed, I have always believed that, labels notwithstanding, the Federal Communications Commission (FCC) program we upheld in that case would have satisfied any of our various standards in affirmative-action cases—including the one the majority fashions today. What truly distinguishes *Metro Broadcasting* from our other affirmative-action precedents is the distinctive goal of the federal program in that case. Instead of merely seeking to remedy past discrimination, the FCC program was intended to achieve future benefits in the form of broadcast diversity. Reliance on race as a legitimate means of achieving diversity was first endorsed by Justice Powell in *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265, 311–319 (1978). Later, in *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267 (1986), I also argued that race is not always irrelevant to governmental decisionmaking, see *id.,* at 314–315 (STEVENS, J., dissenting); in response, JUSTICE O'CONNOR correctly noted that, although the school board had relied on an interest in providing black teachers to serve as role models for black students, that interest "should not be confused with the very different goal of promoting racial diversity among the faculty." *Id.,* at 288, n. She then added that, because the school board had not relied on an interest in diversity, it was not "necessary to discuss the magnitude of that interest or its applicability in this case." *Ibid.*

Thus, prior to *Metro Broadcasting,* the interest in diversity had been mentioned in a few opinions, but it is perfectly clear that the Court had not yet decided whether that interest had sufficient magnitude to justify a racial classification. *Metro Broadcasting,* of course, answered that question in the

affirmative. The majority today overrules *Metro Broadcasting* only insofar as it is "inconsistent with [the] holding" that strict scrutiny applies to "benign" racial classifications promulgated by the Federal Government. *Ante,* at 227. The proposition that fostering diversity may provide a sufficient interest to justify such a program is *not* inconsistent with the Court's holding today—indeed, the question is not remotely presented in this case—and I do not take the Court's opinion to diminish that aspect of our decision in *Metro Broadcasting.*

The Court's suggestion that it may be necessary in the future to overrule *Fullilove* in order to restore the fabric of the law, *ante,* at 235, is even more disinguous than its treatment of *Metro Broadcasting.* For the Court endorses the "strict scrutiny" standard that Justice Powell applied in *Bakke,* see *ante,* at 224, and acknowledges that he applied that standard in *Fullilove* as well, *ante,* at 218–219. Moreover, Chief Justice Burger also expressly concluded that the program we considered in *Fullilove* was valid under any of the tests articulated in *Bakke,* which of course included Justice Powell's. 448 U. S., at 492. The Court thus adopts a standard applied in *Fullilove* at the same time it questions that case's continued vitality and accuses it of departing from prior law. I continue to believe that the *Fullilove* case was incorrectly decided, see *id.,* at 532–554 (STEVENS, J., dissenting), but neither my dissent nor that filed by Justice Stewart, *id.,* at 522–532, contained any suggestion that the issue the Court was resolving had been decided before.[13] As was true

---

[13] Of course, Justice Stewart believed that his view, disapproving of racial classifications of any kind, was consistent with this Court's precedents. See *ante,* at 234–235, citing 448 U. S., at 523–526. But he did not claim that the question whether the Federal Government could engage in race-conscious affirmative action had been decided before *Fullilove.* The fact that a Justice dissents from an opinion means that he disagrees with the result; it does not usually mean that he believes the decision so departs from the fabric of the law that its reasoning ought to be repudiated at the

of *Metro Broadcasting*, the Court in *Fullilove* decided an important, novel, and difficult question. Providing a different answer to a similar question today cannot fairly be characterized as merely "restoring" previously settled law.

V

The Court's holding in *Fullilove* surely governs the result in this case. The Public Works Employment Act of 1977 (1977 Act), 91 Stat. 116, which this Court upheld in *Fullilove*, is different in several critical respects from the portions of the Small Business Act (SBA), 72 Stat. 384, as amended, 15 U. S. C. § 631 *et seq.*, and STURAA, 101 Stat. 132, challenged in this case. Each of those differences makes the current program designed to provide assistance to DBE's significantly less objectionable than the 1977 categorical grant of $400 million in exchange for a 10% set-aside in public contracts to "a class of investors defined solely by racial characteristics." *Fullilove*, 448 U. S., at 532 (STEVENS, J., dissenting). In no meaningful respect is the current scheme more objectionable than the 1977 Act. Thus, if the 1977 Act was constitutional, then so must be the SBA and STURAA. Indeed, even if my dissenting views in *Fullilove* had prevailed, this program would be valid.

Unlike the 1977 Act, the present statutory scheme does not make race the sole criterion of eligibility for participation in the program. Race does give rise to a rebuttable presumption of social disadvantage which, at least under STURAA,[14] gives rise to a second rebuttable presumption

---

next opportunity. Much less does a dissent bind or authorize a later majority to reject a precedent with which it disagrees.

[14] STURAA accords a rebuttable presumption of both social and economic disadvantage to members of racial minority groups. 49 CFR § 23.62 (1994). In contrast, § 8(a) of the SBA accords a presumption only of social disadvantage, 13 CFR § 124.105(b) (1995); the applicant has the burden of demonstrating economic disadvantage, *id.*, § 124.106. Finally, § 8(d) of the SBA accords at least a presumption of social disadvantage, but it is ambiguous as to whether economic disadvantage is presumed or

of economic disadvantage. 49 CFR § 23:62 (1994). But a small business may qualify as a DBE, by showing that it is both socially and economically disadvantaged, even if it receives neither of these presumptions. 13 CFR §§ 124.105(c), 124.106 (1995); 48 CFR § 19.703 (1994); 49 CFR pt. 23, subpt. D., Apps. A and C (1994). Thus, the current preference is more inclusive than the 1977 Act because it does not make race a necessary qualification.

More importantly, race is not a sufficient qualification. Whereas a millionaire with a long history of financial successes, who was a member of numerous social clubs and trade associations, would have qualified for a preference under the 1977 Act merely because he was an Asian-American or an African-American, see *Fullilove*, 448 U. S., at 537–538, 540, 543–544, and n. 16, 546 (STEVENS, J., dissenting), neither the SBA nor STURAA creates any such anomaly. The DBE program excludes members of minority races who are not, in fact, socially or economically disadvantaged.[15] 13 CFR § 124.106(a)(ii) (1995); 49 CFR § 23.69 (1994). The presumption of social disadvantage reflects the unfortunate fact that irrational racial prejudice—along with its lingering effects—still survives.[16] The presumption of economic disadvantage

---

must be shown. See 15 U. S. C. § 637(d)(3) (1988 ed. and Supp. V); 13 CFR § 124.601 (1995).

[15] The Government apparently takes this exclusion seriously. See *Autek Systems Corp.* v. *United States*, 835 F. Supp. 13 (DC 1993) (upholding Small Business Administration decision that minority business owner's personal income disqualified him from DBE status under § 8(a) program), aff'd, 43 F. 3d 712 (CADC 1994).

[16] "The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Ante*, at 237.

"Our findings clearly state that groups such as black Americans, Hispanic Americans, and Native Americans, have been and continue to be discriminated against and that this discrimination has led to the social disadvantagement of persons identified by society as members of those groups." 124 Cong. Rec. 34097 (1978)

embodies a recognition that success in the private sector of the economy is often attributable, in part, to social skills and relationships. Unlike the 1977 set-asides, the current preference is designed to overcome the social and economic disadvantages that are often associated with racial characteristics. If, in a particular case, these disadvantages are not present, the presumptions can be rebutted. 13 CFR §§ 124.601–124.610 (1995); 49 CFR § 23.69 (1994). The program is thus designed to allow race to play a part in the decisional process only when there is a meaningful basis for assuming its relevance. In this connection, I think it is particularly significant that the current program targets the negotiation of subcontracts between private firms. The 1977 Act applied entirely to the award of public contracts, an area of the economy in which social relationships should be irrelevant and in which proper supervision of government contracting officers should preclude any discrimination against particular bidders on account of their race. In this case, in contrast, the program seeks to overcome barriers of prejudice between private parties—specifically, between general contractors and subcontractors. The SBA and STURAA embody Congress' recognition that such barriers may actually handicap minority firms seeking business as subcontractors from established leaders in the industry that have a history of doing business with their golfing partners. Indeed, minority subcontractors may face more obstacles than direct, intentional racial prejudice: They may face particular barriers simply because they are more likely to be new in the business and less likely to know others in the business. Given such difficulties, Congress could reasonably find that a minority subcontractor is less likely to receive favors from the entrenched businesspersons who award subcontracts only to people with whom—or with whose friends—they have an existing relationship. This program, then, if in part a remedy for past discrimination, is most importantly a

forward-looking response to practical problems faced by minority subcontractors.

The current program contains another forward-looking component that the 1977 set-asides did not share. Section 8(a) of the SBA provides for periodic review of the status of DBE's, 15 U. S. C. §§ 637(a)(B)–(C) (1988 ed., Supp. V); 13 CFR § 124.602(a) (1995),[17] and DBE status can be challenged by a competitor at any time under any of the routes to certification. 13 CFR § 124.603 (1995); 49 CFR § 23.69 (1994). Such review prevents ineligible firms from taking part in the program solely because of their minority ownership, even when those firms were once disadvantaged but have since become successful. The emphasis on review also indicates the Administration's anticipation that after their presumed disadvantages have been overcome, firms will "graduate" into a status in which they will be able to compete for business, including prime contracts, on an equal basis. 13 CFR § 124.208 (1995). As with other phases of the statutory policy of encouraging the formation and growth of small business enterprises, this program is intended to facilitate entry and increase competition in the free market.

Significantly, the current program, unlike the 1977 set-aside, does not establish any requirement—numerical or otherwise—that a general contractor must hire DBE subcontractors. The program we upheld in *Fullilove* required that 10% of the federal grant for every federally funded project be expended on minority business enterprises. In contrast, the current program contains no quota. Although it provides monetary incentives to general contractors to hire DBE subcontractors, it does not require them to hire DBE's,

---

[17] The Department of Transportation strongly urges States to institute periodic review of businesses certified as DBE's under STURAA, 49 CFR pt. 23, subpt. D, App. A (1994), but it does not mandate such review. Respondents point us to no provisions for review of § 8(d) certification, although such review may be derivative for those businesses that receive § 8(d) certification as a result of § 8(a) or STURAA certification.

and they do not lose their contracts if they fail to do so. The importance of this incentive to general contractors (who always seek to offer the lowest bid) should not be underestimated; but the preference here is far less rigid, and thus more narrowly tailored, than the 1977 Act. Cf. *Bakke*, 438 U. S., at 319–320 (opinion of Powell, J.) (distinguishing between numerical set-asides and consideration of race as a factor).

Finally, the record shows a dramatic contrast between the sparse deliberations that preceded the 1977 Act, see *Fullilove*, 448 U. S., at 549–550 (STEVENS, J., dissenting), and the extensive hearings conducted in several Congresses before the current program was developed.[18] However we might

---

[18] Respondents point us to the following legislative history:

H. R. 5612, To amend the Small Business Act to Extend the current SBA 8(a) Pilot Program: Hearing on H. R. 5612 before the Senate Select Committee on Small Business, 96th Cong., 2d Sess. (1980); Small and Minority Business in the Decade of the 1980's (Part 1): Hearings before the House Committee on Small Business, 97th Cong., 1st Sess. (1981); Minority Business and Its Contribution to the U. S. Economy: Hearing before the Senate Committee on Small Business, 97th Cong., 2d Sess. (1982); Federal Contracting Opportunities for Minority and Women-Owned Businesses— An Examination of the 8(d) Subcontracting Program: Hearings before the Senate Committee on Small Business, 98th Cong., 1st Sess. (1983); Women Entrepreneurs—Their Success and Problems: Hearing before the Senate Committee on Small Business, 98th Cong., 2d Sess. (1984); State of Hispanic Small Business in America: Hearing before the Subcommittee on SBA and SBIC Authority, Minority Enterprise, and General Small Business Problems of the House Committee on Small Business, 99th Cong., 1st Sess. (1985); Minority Enterprise and General Small Business Problems: Hearing before the Subcommittee on SBA and SBIC Authority, Minority Enterprise, and General Small Business Problems of the House Committee on Small Business, 99th Cong., 2d Sess. (1986); Disadvantaged Business Set-Asides in Transportation Construction Projects: Hearings before the Subcommittee on Procurement, Innovation, and Minority Enterprise Development of the House Committee on Small Business, 100th Cong., 2d Sess. (1988); Barriers to Full Minority Participation in Federally Funded Highway Construction Projects: Hearing before a Subcommittee of the House Committee on Government Operations, 100th Cong., 2d Sess. (1988);

evaluate the benefits and costs—both fiscal and social—of this or any other affirmative-action program, our obligation to give deference to Congress' policy choices is much more demanding in this case than it was in *Fullilove*. If the 1977 program of race-based set-asides satisfied the strict scrutiny dictated by Justice Powell's vision of the Constitution—a vision the Court expressly endorses today—it must follow as night follows the day that the Court of Appeals' judgment upholding this more carefully crafted program should be affirmed.

## VI

My skeptical scrutiny of the Court's opinion leaves me in dissent. The majority's concept of "consistency" ignores a difference, fundamental to the idea of equal protection, between oppression and assistance. The majority's concept of "congruence" ignores a difference, fundamental to our constitutional system, between the Federal Government and the States. And the majority's concept of *stare decisis* ignores the force of binding precedent. I would affirm the judgment of the Court of Appeals.

JUSTICE SOUTER, with whom JUSTICE GINSBURG and JUSTICE BREYER join, dissenting.

As this case worked its way through the federal courts prior to the grant of certiorari that brought it here, petitioner Adarand Constructors, Inc., was understood to have raised only one significant claim: that before a federal agency may exceed the goals adopted by Congress in implementing a race-based remedial program, the Fifth and Fourteenth Amendments require the agency to make specific findings of

---

Surety Bonds and Minority Contractors: Hearing before the Subcommittee on Commerce, Consumer Protection, and Competitiveness of the House Committee on Energy and Commerce, 100th Cong., 2d Sess. (1988); Small Business Problems: Hearings before the House Committee on Small Business, 100th Cong., 1st Sess. (1987). See Brief for Respondents 9–10, n. 9.

discrimination, as under *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989), sufficient to justify surpassing the congressional objective. See 16 F. 3d 1537, 1544 (CA10 1994) ("The gravamen of Adarand's argument is that the CFLHD must make particularized findings of past discrimination to justify its race-conscious SCC program under *Croson* because the precise goals of the challenged SCC program were fashioned and specified by an agency and not by Congress"); *Adarand Constructors, Inc.* v. *Skinner*, 790 F. Supp. 240, 242 (Colo. 1992) ("Plaintiff's motion for summary judgment seeks a declaratory judgment and permanent injunction against the DOT, the FHA and the CFLHD until specific findings of discrimination are made by the defendants as allegedly required by *City of Richmond v. Croson*"); cf. Complaint ¶ 28, App. 20 (federal regulations violate the Fourteenth and Fifteenth Amendments by requiring "the use of racial and gender preferences in the award of federally financed highway construction contracts, without any findings of past discrimination in the award of such contracts").

Although the petition for certiorari added an antecedent question challenging the use, under the Fifth and Fourteenth Amendments, of any standard below strict scrutiny to judge the constitutionality of the statutes under which respondents acted, I would not have entertained that question in this case. The statutory scheme must be treated as constitutional if *Fullilove* v. *Klutznick*, 448 U. S. 448 (1980), is applied, and petitioner did not identify any of the factual premises on which *Fullilove* rested as having disappeared since that case was decided.

As the Court's opinion explains in detail, the scheme in question provides financial incentives to general contractors to hire subcontractors who have been certified as disadvantaged business enterprises (DBE's) on the basis of certain race-based presumptions. See generally *ante*, at 206–208. These statutes (or the originals, of which the current ones are reenactments) have previously been justified as provid-

ing remedies for the continuing effects of past discrimination, see, *e. g., Fullilove, supra,* at 465–466 (citing legislative history describing SBA § 8(a) as remedial); S. Rep. No. 100–4, p. 11 (1987) (Committee Report stating that the DBE provision of STURAA was "necessary to remedy the discrimination faced by socially and economically disadvantaged persons"), and the Government has so defended them in this case, Brief for Respondents 33. Since petitioner has not claimed the obsolescence of any particular fact on which the *Fullilove* Court upheld the statute, no issue has come up to us that might be resolved in a way that would render *Fullilove* inapposite. See, *e. g.,* 16 F. 3d, at 1544 ("Adarand has stipulated that section 502 of the Small Business Act . . . satisfies the evidentiary requirements of *Fullilove*"); Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment in No. 90–C–1413 (D. Colo.), p. 12 (*Fullilove* is not applicable to the case at bar because "[f]irst and foremost, *Fullilove* stands for only one proposition relevant here: the ability of the U. S. Congress, under certain limited circumstances, to adopt a race-base[d] remedy").

In these circumstances, I agree with JUSTICE STEVENS's conclusion that *stare decisis* compels the application of *Fullilove.* Although *Fullilove* did not reflect doctrinal consistency, its several opinions produced a result on shared grounds that petitioner does not attack: that discrimination in the construction industry had been subject to government acquiescence, with effects that remain and that may be addressed by some preferential treatment falling within the congressional power under § 5 of the Fourteenth Amendment.[1] *Fullilove,* 448 U. S., at 477–478 (opinion of Burger,

---

[1] If the statutes are within the § 5 power, they are just as enforceable when the National Government makes a construction contract directly as when it funnels construction money through the States. In any event, as JUSTICE STEVENS has noted, see *ante,* at 247–248, n. 5, 248–249, n. 6, it is

C. J.); *id.*, at 503 (Powell, J., concurring); *id.*, at 520–521 (Marshall, J., concurring in judgment). Once *Fullilove* is applied, as JUSTICE STEVENS points out, it follows that the statutes in question here (which are substantially better tailored to the harm being remedied than the statute endorsed in *Fullilove*, see *ante*, at 259–264 (STEVENS, J., dissenting)) pass muster under Fifth Amendment due process and Fourteenth Amendment equal protection.

The Court today, however, does not reach the application of *Fullilove* to the facts of this case, and on remand it will be incumbent on the Government and petitioner to address anew the facts upon which statutes like these must be judged on the Government's remedial theory of justification: facts about the current effects of past discrimination, the necessity for a preferential remedy, and the suitability of this particular preferential scheme. Petitioner could, of course, have raised all of these issues under the standard employed by the *Fullilove* plurality; and without now trying to read the current congressional evidentiary record that may bear on resolving these issues I have to recognize the possibility that proof of changed facts might have rendered *Fullilove*'s conclusion obsolete as judged under the *Fullilove* plurality's own standard. Be that as it may, it seems fair to ask whether the statutes will meet a different fate from what *Fullilove* would have decreed. The answer is, quite probably not, though of course there will be some interpretive forks in the road before the significance of strict scrutiny for congressional remedial statutes becomes entirely clear.

The result in *Fullilove* was controlled by the plurality for whom Chief Justice Burger spoke in announcing the judgment. Although his opinion did not adopt any label for the standard it applied, and although it was later seen as calling for less than strict scrutiny, *Metro Broadcasting, Inc.* v.

---

not clear whether the current challenge implicates only Fifth Amendment due process or Fourteenth Amendment equal protection as well.

*FCC,* 497 U. S. 547, 564 (1990), none other than Justice Powell joined the plurality opinion as comporting with his own view that a strict scrutiny standard should be applied to all injurious race-based classifications. *Fullilove, supra,* at 495–496 (concurring opinion) ("Although I would place greater emphasis than THE CHIEF JUSTICE on the need to articulate judicial standards of review in conventional terms, I view his opinion announcing the judgment as substantially in accord with my views"). Chief Justice Burger's noncategorical approach is probably best seen not as more lenient than strict scrutiny but as reflecting his conviction that the treble-tiered scrutiny structure merely embroidered on a single standard of reasonableness whenever an equal protection challenge required a balancing of justification against probable harm. See *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 451 (1985) (STEVENS, J., concurring, joined by Burger, C. J.). Indeed, the Court's very recognition today that strict scrutiny can be compatible with the survival of a classification so reviewed demonstrates that our concepts of equal protection enjoy a greater elasticity than the standard categories might suggest. See *ante,* at 237 ("[W]e wish to dispel the notion that strict scrutiny is 'strict in theory, but fatal in fact.' *Fullilove, supra,* at 519 (Marshall, J., concurring in judgment)"); see also *Missouri* v. *Jenkins, ante,* at 112 (O'CONNOR, J., concurring) ("But it is not true that strict scrutiny is 'strict in theory, but fatal in fact' ").

In assessing the degree to which today's holding portends a departure from past practice, it is also worth noting that nothing in today's opinion implies any view of Congress's § 5 power and the deference due its exercise that differs from the views expressed by the *Fullilove* plurality. The Court simply notes the observation in *Croson* "that the Court's 'treatment of an exercise of congressional power in *Fullilove* cannot be dispositive here,' because *Croson's* facts did not implicate Congress's broad power under § 5 of the Fourteenth Amendment," *ante,* at 222, and explains that there is dis-

agreement among today's majority about the extent of the §5 power, *ante*, at 230–231. There is therefore no reason to treat the opinion as affecting one way or another the views of §5 power, described as "broad," *ante*, at 269, "unique," *Fullilove*, 448 U. S., at 500 (Powell, J., concurring), and "unlike [that of] any state or political subdivision," *Croson*, 488 U. S., at 490 (opinion of O'CONNOR, J.). See also *Jenkins*, *ante*, at 113 (O'CONNOR, J., concurring) ("Congress . . . enjoys ' "discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," ' *Croson*, 488 U. S., at 490 (quoting *Katzenbach* v. *Morgan*, 384 U. S., at 651)"). Thus, today's decision should leave §5 exactly where it is as the source of an interest of the National Government sufficiently important to satisfy the corresponding requirement of the strict scrutiny test.

Finally, I should say that I do not understand that today's decision will necessarily have any effect on the resolution of an issue that was just as pertinent under *Fullilove*'s unlabeled standard as it is under the standard of strict scrutiny now adopted by the Court. The Court has long accepted the view that constitutional authority to remedy past discrimination is not limited to the power to forbid its continuation, but extends to eliminating those effects that would otherwise persist and skew the operation of public systems even in the absence of current intent to practice any discrimination. See *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 418 (1975) ("Where racial discrimination is concerned, 'the [district] court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future' "), quoting *Louisiana* v. *United States*, 380 U. S. 145, 154 (1965). This is so whether the remedial authority is exercised by a court, see *ibid.*; *Green* v. *School Bd. of New Kent Cty.*, 391 U. S. 430, 437 (1968), the Congress, see *Fullilove*, *supra*, at 502 (Powell, J., concurring), or some other legislature, see *Croson*, *supra*, at 491–492 (opin-

ion of O'CONNOR, J.). Indeed, a majority of the Court today reiterates that there are circumstances in which Government may, consistently with the Constitution, adopt programs aimed at remedying the effects of past invidious discrimination. See, *e. g., ante,* at 228–229, 237 (opinion of O'CONNOR, J.); *ante,* at 243 (STEVENS, J., with whom GINSBURG, J., joins, dissenting); *post,* at 273, 275–276 (GINSBURG, J., with whom BREYER, J., joins, dissenting); *Jenkins, ante,* at 112 (O'CONNOR, J., concurring) (noting the critical difference "between unconstitutional discrimination and narrowly tailored remedial programs that legislatures may enact to further the compelling governmental interest in redressing the effects of past discrimination").

When the extirpation of lingering discriminatory effects is thought to require a catchup mechanism, like the racially preferential inducement under the statutes considered here, the result may be that some members of the historically favored race are hurt by that remedial mechanism, however innocent they may be of any personal responsibility for any discriminatory conduct. When this price is considered reasonable, it is in part because it is a price to be paid only temporarily; if the justification for the preference is eliminating the effects of a past practice, the assumption is that the effects will themselves recede into the past, becoming attenuated and finally disappearing. Thus, Justice Powell wrote in his concurring opinion in *Fullilove* that the "temporary nature of this remedy ensures that a race-conscious program will not last longer than the discriminatory effects it is designed to eliminate." 448 U. S., at 513; *ante,* at 237–238 (opinion of the Court).

Surely the transition from the *Fullilove* plurality view (in which Justice Powell joined) to today's strict scrutiny (which will presumably be applied as Justice Powell employed it) does not signal a change in the standard by which the burden of a remedial racial preference is to be judged as reasonable or not at any given time. If in the District Court Adarand

had chosen to press a challenge to the reasonableness of the burden of these statutes,[2] more than a decade after *Fullilove* had examined such a burden, I doubt that the claim would have fared any differently from the way it will now be treated on remand from this Court.

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, dissenting.

For the reasons stated by JUSTICE SOUTER, and in view of the attention the political branches are currently giving the matter of affirmative action, I see no compelling cause for the intervention the Court has made in this case. I further agree with JUSTICE STEVENS that, in this area, large deference is owed by the Judiciary to "Congress' institutional competence and constitutional authority to overcome historic racial subjugation." *Ante,* at 253 (STEVENS, J., dissenting); see *ante,* at 254–255.[1] I write separately to underscore not the differences the several opinions in this case display, but the considerable field of agreement—the common understandings and concerns—revealed in opinions that together speak for a majority of the Court.

---

[2] I say "press a challenge" because petitioner's Memorandum in Support of Summary Judgment did include an argument challenging the reasonableness of the duration of the statutory scheme; but the durational claim was not, so far as I am aware, stated elsewhere, and, in any event, was not the gravamen of the complaint.

[1] On congressional authority to enforce the equal protection principle, see, *e. g., Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 286 (1964) (Douglas, J., concurring) (recognizing Congress' authority, under § 5 of the Fourteenth Amendment, to "pu[t] an end to all obstructionist strategies and allo[w] every person—whatever his race, creed, or color—to patronize all places of public accommodation without discrimination whether he travels interstate or intrastate."); *id.,* at 291, 293 (Goldberg, J., concurring) ("primary purpose of the Civil Rights Act of 1964 . . . is the vindication of human dignity"; "Congress clearly had authority under both § 5 of the Fourteenth Amendment and the Commerce Clause" to enact the law); G. Gunther, Constitutional Law 147–151 (12th ed. 1991).

I

The statutes and regulations at issue, as the Court indicates, were adopted by the political branches in response to an "unfortunate reality": "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country." *Ante*, at 237 (lead opinion). The United States suffers from those lingering effects because, for most of our Nation's history, the idea that "we are just one race," *ante*, at 239 (SCALIA, J., concurring in part and concurring in judgment), was not embraced. For generations, our lawmakers and judges were unprepared to say that there is in this land no superior race, no race inferior to any other. In *Plessy* v. *Ferguson*, 163 U. S. 537 (1896), not only did this Court endorse the oppressive practice of race segregation, but even Justice Harlan, the advocate of a "color-blind" Constitution, stated:

> "The white race deems itself to be the dominant race in this country. And so it is, in prestige, in achievements, in education, in wealth and in power. So, I doubt not, it will continue to be for all time, if it remains true to its great heritage and holds fast to the principles of constitutional liberty." *Id.*, at 559 (dissenting opinion).

Not until *Loving* v. *Virginia*, 388 U. S. 1 (1967), which held unconstitutional Virginia's ban on interracial marriages, could one say with security that the Constitution and this Court would abide no measure "designed to maintain White Supremacy." *Id.*, at 11.[2]

---

[2] The Court, in 1955 and 1956, refused to rule on the constitutionality of antimiscegenation laws; it twice declined to accept appeals from the decree on which the Virginia Supreme Court of Appeals relied in *Loving*. See *Naim* v. *Naim*, 197 Va. 80, 87 S. E. 2d 749, vacated and remanded, 350 U. S. 891 (1955), reinstated and aff'd, 197 Va. 734, 90 S. E. 2d 849, appeal dism'd, 350 U. S. 985 (1956). *Naim* expressed the state court's view of the legislative purpose served by the Virginia law: "to preserve the racial integrity of [Virginia's] citizens"; to prevent "the corruption of blood," "a

The divisions in this difficult case should not obscure the Court's recognition of the persistence of racial inequality and a majority's acknowledgment of Congress' authority to act affirmatively, not only to end discrimination, but also to counteract discrimination's lingering effects. *Ante,* at 237 (lead opinion); see also *ante,* at 269–270 (SOUTER, J., dissenting). Those effects, reflective of a system of racial caste only recently ended, are evident in our workplaces, markets, and neighborhoods. Job applicants with identical resumés, qualifications, and interview styles still experience different receptions, depending on their race.[3] White and African-American consumers still encounter different deals.[4] People of color looking for housing still face discriminatory treatment by landlords, real estate agents, and mortgage lenders.[5]

---

mongrel breed of citizens," and "the obliteration of racial pride." 197 Va., at 90, 87 S. E. 2d, at 756.

[3] See, *e. g.,* H. Cross, G. Kennedy, J. Mell, & W. Zimmermann, Employer Hiring Practices: Differential Treatment of Hispanic and Anglo Job Seekers 42 (Urban Institute Report 90–4, 1990) (*e. g.,* Anglo applicants sent out by investigators received 52% more job offers than matched Hispanics); M. Turner, M. Fix, & R. Struyk, Opportunities Denied, Opportunities Diminished: Racial Discrimination in Hiring xi (Urban Institute Report 91–9, 1991) ("In one out of five audits, the white applicant was able to advance farther through the hiring process than his black counterpart. In one out of eight audits, the white was offered a job although his equally qualified black partner was not. In contrast, black auditors advanced farther than their white counterparts only 7 percent of the time, and received job offers while their white partners did not in 5 percent of the audits.").

[4] See, *e. g.,* Ayres, Fair Driving: Gender and Race Discrimination in Retail Car Negotiations, 104 Harv. L. Rev. 817, 821–822, 819, 828 (1991) ("blacks and women simply cannot buy the same car for the same price as can white men using identical bargaining strategies"; the final offers given white female testers reflected 40 percent higher markups than those given white male testers; final offer markups for black male testers were twice as high, and for black female testers three times as high as for white male testers).

[5] See, *e. g.,* A Common Destiny: Blacks and American Society 50 (G. Jaynes & R. Williams eds. 1989) ("[I]n many metropolitan areas one-quarter to one-half of all [housing] inquiries by blacks are met by clearly

Minority entrepreneurs sometimes fail to gain contracts though they are the low bidders, and they are sometimes refused work even after winning contracts.[6] Bias both conscious and unconscious, reflecting traditional and unexamined habits of thought,[7] keeps up barriers that must come down if equal opportunity and nondiscrimination are ever genuinely to become this country's law and practice.

Given this history and its practical consequences, Congress surely can conclude that a carefully designed affirmative action program may help to realize, finally, the "equal protection of the laws" the Fourteenth Amendment has promised since 1868.[8]

---

discriminatory responses."); M. Turner, R. Struyk, & J. Yinger, U. S. Dept. of Housing and Urban Development, Housing Discrimination Study: Synthesis i–vii (Sept. 1991) (1989 audit study of housing searches in 25 metropolitan areas; over half of African-American and Hispanic testers seeking to rent or buy experienced some form of unfavorable treatment compared to paired white testers); Leahy, Are Racial Factors Important for the Allocation of Mortgage Money?, 44 Am. J. Econ. & Soc. 185, 193 (1985) (controlling for socioeconomic factors, and concluding that "even when neighborhoods appear to be similar on every major mortgage-lending criterion except race, mortgage-lending outcomes are still unequal").

[6] See, e. g., Associated General Contractors v. Coalition for Economic Equity, 950 F. 2d 1401, 1415 (CA9 1991) (detailing examples in San Francisco).

[7] Cf. Wygant v. Jackson Bd. of Ed., 476 U. S. 267, 318 (1986) (STEVENS, J., dissenting); Califano v. Goldfarb, 430 U. S. 199, 222–223 (1977) (STEVENS, J., concurring in judgment).

[8] On the differences between laws designed to benefit a historically disfavored group and laws designed to burden such a group, see, e. g., Carter, When Victims Happen To Be Black, 97 Yale L. J. 420, 433–434 (1988) ("[W]hatever the source of racism, to count it the same as racialism, to say that two centuries of struggle for the most basic of civil rights have been mostly about freedom from racial categorization rather than freedom from racial oppression, is to trivialize the lives and deaths of those who have suffered under racism. To pretend . . . that the issue presented in Bakke was the same as the issue in Brown is to pretend that history never happened and that the present doesn't exist.").

## II

The lead opinion uses one term, "strict scrutiny," to describe the standard of judicial review for all governmental classifications by race. *Ante*, at 235–237. But that opinion's elaboration strongly suggests that the strict standard announced is indeed "fatal" for classifications burdening groups that have suffered discrimination in our society. That seems to me, and, I believe, to the Court, the enduring lesson one should draw from *Korematsu* v. *United States*, 323 U. S. 214 (1944); for in that case, scrutiny the Court described as "most rigid," *id.*, at 216, nonetheless yielded a pass for an odious, gravely injurious racial classification. See *ante*, at 214–215 (lead opinion). A *Korematsu*-type classification, as I read the opinions in this case, will never again survive scrutiny: Such a classification, history and precedent instruct, properly ranks as prohibited.

For a classification made to hasten the day when "we are just one race," *ante*, at 239 (SCALIA, J., concurring in part and concurring in judgment), however, the lead opinion has dispelled the notion that "strict scrutiny" is " 'fatal in fact.' " *Ante*, at 237 (quoting *Fullilove* v. *Klutznick*, 448 U. S. 448, 519 (1980) (Marshall, J., concurring in judgment)). Properly, a majority of the Court calls for review that is searching, in order to ferret out classifications in reality malign, but masquerading as benign. See *ante*, at 228–229 (lead opinion). The Court's once lax review of sex-based classifications demonstrates the need for such suspicion. See, *e. g.*, *Hoyt* v. *Florida*, 368 U. S. 57, 60 (1961) (upholding women's "privilege" of automatic exemption from jury service); *Goesaert* v. *Cleary*, 335 U. S. 464 (1948) (upholding Michigan law barring women from employment as bartenders); see also Johnston & Knapp, Sex Discrimination by Law: A Study in Judicial Perspective, 46 N. Y. U. L. Rev. 675 (1971). Today's decision thus usefully reiterates that the purpose of strict scrutiny "is precisely to distinguish legitimate from

illegitimate uses of race in governmental decisionmaking," *ante*, at 228 (lead opinion), "to 'differentiate between' permissible and impermissible governmental use of race," *ibid.*, to distinguish " 'between a "No Trespassing" sign and a welcome mat,' " *ante*, at 229.

Close review also is in order for this further reason. As JUSTICE SOUTER points out, *ante*, at 270 (dissenting opinion), and as this very case shows, some members of the historically favored race can be hurt by catchup mechanisms designed to cope with the lingering effects of entrenched racial subjugation. Court review can ensure that preferences are not so large as to trammel unduly upon the opportunities of others or interfere too harshly with legitimate expectations of persons in once-preferred groups. See, *e. g., Bridgeport Guardians, Inc.* v. *Bridgeport Civil Service Comm'n,* 482 F. 2d 1333, 1341 (CA2 1973).

\* \* \*

While I would not disturb the programs challenged in this case, and would leave their improvement to the political branches, I see today's decision as one that allows our precedent to evolve, still to be informed by and responsive to changing conditions.